[This opinion has been published in *Ohio Official Reports* at 88 Ohio St.3d 387.]

THE STATE OF OHIO, APPELLEE, *v.* GOWDY, APPELLANT.

[Cite as *State v. Gowdy*, 2000-Ohio-355.]

*Criminal procedure—Notice requirement for sexual offender classification hearings under R.C. 2950.09(B)(1) is mandatory.*

The notice requirement for sexual offender classification hearings under R.C. 2950.09(B)(1) is mandatory.

(No. 98-2301—Submitted November 30, 1999—Decided April 28, 2000.)

APPEAL from the Court of Appeals for Hamilton County, No. C-970359.

_____

{¶ 1} Huey L. Gowdy, defendant-appellant, and Valerie Parks lived together in Parks's apartment from July 1996 to December 1996. After defendant developed a relationship with another woman, he moved out. On January 21, 1997, at around 11:15 p.m., Parks and her date, Montez Rhodes, were at Parks's apartment watching TV when Parks received a telephone call from defendant. Defendant told Parks that he wanted to come over to talk, but Parks told him she had company. Defendant told her he was coming over anyway.

{¶ 2} About ten to fifteen minutes later, there was a knock at the door. Parks opened the door a crack to step outside to talk to defendant because she did not want to wake her three children who were asleep in the apartment. Defendant pushed the door open, came in, and began yelling and cussing at Parks. At defendant's urging, Rhodes left.

{¶ 3} As Rhodes was walking out, Parks tried to walk out with him to apologize, but defendant jumped in front of her so she could not follow him. Defendant pushed Parks down on the couch and locked the door. Defendant questioned Parks about what she had been doing with Rhodes before he arrived and accused her of having sex with Rhodes, which Parks denied.

**{¶ 4}** According to Parks's testimony, defendant grabbed her and forced his fingers into her vagina. Parks testified that she struggled to resist defendant, but he overpowered her and raped her. Parks further testified that defendant warned her not to tell anyone because he would be watching and would come back and hurt her.

**{¶ 5}** After defendant left, Parks called her eldest child's father, Kevin Taylor, and told him what had happened. Shortly thereafter, Rhodes came back to the apartment. He testified that after he got home, he decided he should go back to check on Parks, so he called his cousin, LaDon Woods, to go with him. When he and Woods arrived at Parks's apartment about forty-five minutes after Rhodes had left, Parks came to the door crying. Rhodes asked her what was wrong, and she told them that defendant had raped her.

**{¶ 6}** Both Rhodes and Taylor urged Parks to call the police and go to the hospital, but Parks testified that she did not because she feared retribution from defendant. The next morning after she got her children to school, Parks went to the Justice Center, seeking a restraining order, but was told she had to go to Hamilton County's Private Complaint Program ("Private Complaint"). Parks testified that Private Complaint informed her that in order to get a restraining order, defendant would have to participate in the program. After Parks told the worker at Private Complaint that defendant would not attend because he had outstanding warrants against him, the worker suggested that Parks file domestic violence charges against defendant.

**{¶ 7}** Later in the evening of January 22, 1997, Parks went to Bethesda Hospital, where she told staff that she had been raped. The hospital notified the police, and after Parks was examined, she related her story to Officer Shawn George. After Officer George took her information, he collected, as evidence, the clothing Parks had been wearing the previous night.

{¶ 8} At trial, defendant testified that the incident was consensual. Defendant testified that Parks was jealous about his relationship with his new girlfriend, so Parks filed charges against him in retribution. On April 28, 1997, a jury found defendant guilty of two counts of rape. The court set the sentencing hearing for May 9, 1997. The court did not discuss the sexual offender classification hearing at that time.

{¶ 9} At sentencing, the trial judge indicated that defendant had filed a *pro se* motion that the court considered to be a motion for new trial. Defense counsel noted that in that motion, defendant had made comments indicating that he was unhappy with her representation. On that basis, defense counsel requested permission to withdraw from the case. The trial judge denied her request and proceeded immediately with the sexual offender classification hearing.[1] Defense counsel did not formally object to going forward with the sexual offender classification hearing. Following a brief hearing, the trial judge adjudicated defendant a sexual predator. After overruling a defense motion for an acquittal, the judge sentenced defendant. The Hamilton County Court of Appeals affirmed defendant's convictions, sentence, and sexual predator classification.

{¶ 10} The cause is now before this court upon the allowance of a discretionary appeal.

―――――――――――

*Michael K. Allen*, Hamilton County Prosecuting Attorney, and *Phillip R. Cummings*, Assistant Prosecuting Attorney; *Betty D. Montgomery*, Attorney General, and *David M. Gormley*, Assistant Attorney General, for appellee.

*David H. Bodiker*, Ohio Public Defender, and *Jane P. Perry*, Assistant State Public Defender, for appellant.

―――――――――――

1. In *State v. Cook* (1998), 83 Ohio St.3d 404, 425, 700 N.E.2d 570, 587, this court referred to the hearing described in R.C. 2950.09(B)(1) as a "sexual predator determination hearing." However, "sexual offender classification hearing" better describes what takes place at the hearing. As such, that is the preferred term.

*Betty D. Montgomery*, Attorney General, and *David M. Gormley*, Associate Solicitor, urging affirmance for *amicus curiae*, Ohio Attorney General.

*Jeffrey M. Gamso* and *Raymond Vasvari*, urging reversal for *amicus curiae*, American Civil Liberties Union of Ohio Foundation, Inc.

_____

**LUNDBERG STRATTON, J.**

{¶ 11} As a threshold matter, the issues of facial due process and all issues regarding the registration and notification provisions of R.C. Chapter 2950 are resolved by *State v. Williams,* No. 99-286, *State v. Worthy,* No. 99-764, and *State v. Suffecool*, No. 99-765, decided today. Today we address due process as it relates to notice of the sexual offender classification hearing under R.C. 2950.09(B), as well as the other non - R.C. Chapter 2950 issues raised in this appeal.

### Batson-Related Peremptory Challenge

{¶ 12} In his first proposition of law, defendant claims that the state used a pretextual reason for a peremptory challenge of an African-American prospective juror in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. During jury selection, the prosecutor exercised a peremptory challenge to excuse prospective juror Albert Smith ("Smith"). Because of the fact-specific nature of this claim, the full transcript merits repeating:

"Mr. Tieger [prosecutor]: Good afternoon, Mr. Smith.

"Prospective Juror Albert Smith: Good afternoon.

"Mr. Tieger: Anything about the questions that anybody has asked that you'd like to talk to us about?

"Prospective Juror Albert Smith: No.

"Mr. Tieger: As far as the religious beliefs, I notice that you're wearing a cross that's hanging outside of your clothes. Do you have some strongly held religious beliefs?

"Prospective Juror Albert Smith: I'm a christian. My belief doesn't cause me not to be able to tell right from wrong.

"The Court: Would you keep your voice up a little bit, sir?  I'm having a hard time hearing.  You said you were a christian?

"Prospective Juror Albert Smith: Yes, I'm a christian.  I know right from wrong, so I would be able to judge, you know.

"The Court: Thank you.  Next question.

"Mr. Tieger: As far as your religion, you know, is that something you take very, very seriously in terms of attending service and going to church, and all of that, on a very regular basis?

"Prospective Juror Albert Smith: Yes.

"Mr. Tieger:  How often would you go?

"Prospective Juror Albert Smith: Every Sunday.

"Mr. Tieger: Okay.  Not during the week at all?

"Prospective Juror Albert Smith: No.  My job doesn't allow me to go through the week.

"Mr. Tieger: And if you don't mind me asking, what religion is that?

"Prospective Juror Albert Smith: Just a christian.

"Mr. Tieger: Okay.

"Prospective Juror Albert Smith: Non-denominational.

"Mr. Tieger: Is there a particular church you belong to?

"Prospective Juror Albert Smith: Yes, Faith Christian Center.

"Mr. Tieger: Where is that located?

"Prospective Juror Albert Smith: Waycross and Kenn Road in Forest Park.

" * * *

"[At this point Smith was asked a few questions about his family.]

"Mr. Tieger: Pass for cause.

" * * *

"The Court: Peremptory challenges, ma'm, are with you—thank you, with the State.

"Mr. Tieger: Judge, I will thank and excuse Mr. Smith.

"The Court: You two approach, please?

"(The following discussion took place at sidebar.)

"The Court: Batson—did you want to say any reason?

"Mr. Tieger: Judge, I don't think that threshold has been made in any way, shape or form. I don't think the defense has raised it.

"Ms. Adams [defense counsel]: I would be happy to raise it at this time.

"The Court: Pardon?

"Ms. Adams: I would raise the Batson challenge at this point, Judge. I think this is the only black male on this jury.

"The Court: Wait a minute. You're right, male.

"Ms. Adams: Right.

"Mr. Tieger: Well, Judge. If the record can reflect, if the Court wants me to respond, there is a black female on the jury, which I did not exercise any type of challenge on, and I'm not going to exercise a challenge on. There is another black male that was excused for cause because he said that he felt he wouldn't be fair in this case because his son was the victim of a crime.

"And I certainly think I have very valid reasons. He comes in wearing a very large cross around his neck that's very visible.

"He stated his religious beliefs are very strongly held. He attends church. That, I thought he was evasive in answering which one. He said he was simply a christian. I mean, there is a lot.

"The Court: I was just inquiring as to your reasoning.

"Mr. Tieger: I asked where his church was. There was a lot of reasons.

"The Court: Thank you. So noted.

"Ms. Adams: Judge, our objection still stands."

{¶ 13} Smith was excused and the court of appeals affirmed the trial court on this issue. Defendant contends that Smith's peremptory removal was discriminatory. Because we find that the trial court did not abuse its discretion in allowing Smith to be excused, we affirm the court of appeals on this issue.

{¶ 14} In 1875, the United States Congress prohibited the race-based exclusion of any qualified citizen from jury service. See Act of Mar. 1, 1875, ch. 114, Section 4, 18 Stat. 336 (codified as amended at Section 243, Title 18, U.S.Code [1948]). Later in 1879, the United States Supreme Court followed suit, holding that a state statute excluding African-Americans from jury service violated a defendant's right to equal protection. *Strauder v. West Virginia* (1879), 100 U.S. (10 Otto) 303, 25 L.Ed. 664. Despite these noble principles, prospective African-American jurors continued to be excluded from jury panels through the use of peremptory challenges. See *Swain v. Alabama* (1965), 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759.

{¶ 15} In *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, the court overruled its opinion in *Swain* and held that a prosecutor's racially motivated exercise of peremptory challenges violated the Equal Protection Clause of the Fourteenth Amendment.[2] The court established a three-step, burden-shifting procedure to determine whether a peremptory challenge is race-based. First, the opponent of the strike must establish a prima facie showing that the attorney purposefully discriminated in exercising a peremptory challenge to dismiss a potential juror. The challenging party "initially must show that he is a member of a racial group capable of being singled out for differential treatment." *Id.*, 476 U.S. at 94, 106 S.Ct. at 1722, 90 L.Ed.2d at 86. In determining whether defendant established a prima facie case of discrimination, we observe that the trial court raised the *Batson* issue, *sua sponte.* The court of appeals noted that both

---

2. *Batson* has since been extended to prohibit peremptory strikes based on gender in *J.E.B. v. Alabama ex rel. T.B.* (1994), 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89.

defendant and Smith are African-Americans and Smith was not challenged for cause but was excused pursuant to a peremptory challenge. We agree with the court of appeals that we must presume that the trial court believed that a prima facie case under *Batson* was established.

{¶ 16} Once the opponent of the strike makes a prima facie showing of purposeful discrimination, the burden shifts to the proponent of the strike to "come forward with a neutral explanation for challenging black jurors." *Id.*, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. Since the trial court found that a prima facie case of discrimination had been established, the burden shifted to the state to rebut the claim.

{¶ 17} In the second step of the *Batson* inquiry, the neutral explanation "need not rise to the level justifying exercise of a challenge for cause." *Id.* In fact, the United States Supreme Court has subsequently held that the "second step of this process does not demand an explanation that is persuasive, or even plausible. 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Purkett v. Elem* (1995), 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839, quoting *Hernandez v. New York* (1991), 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395, 406.

{¶ 18} In determining whether the state advanced a race-neutral explanation for the peremptory challenge, we examine the four reasons proferred by the state. First, the prosecutor pointed out that he had not challenged an African-American female who was ultimately seated on the jury. Second, the prosecutor noted that Smith was wearing a large cross around his neck that was very visible. Third, the prosecutor claimed that in his opinion, Smith's religious beliefs were very strongly held. Fourth, the prosecutor stated that he thought that Smith was evasive in answering which church he attended.

**{¶ 19}** We first observe, as the court of appeals pointed out, that the Fourteenth Amendment protects the rights of *a prospective juror* from the use of discriminatory challenges, and the fact that another juror of the same race remained on the jury does not preclude a holding that the state unlawfully removed Smith from the jury. The exercise of even one peremptory challenge in a purposefully discriminatory manner would violate equal protection. See *State v. White* (1999), 85 Ohio St.3d 433, 436, 709 N.E.2d 140, 147. Therefore, the prosecutor's first statement was in error.

**{¶ 20}** Turning to the other reasons advanced by the prosecutor, the trial court and the court of appeals both acknowledged that Smith's wearing of a religious symbol, his strongly held religious beliefs, and his alleged vagueness in answering the prosecutor's questions were reasons based on something other than race. We agree that these were all reasons that did not, on their face, deny defendant equal protection. Thus, we proceed to step three of the *Batson* inquiry.

**{¶ 21}** In step three, the trial judge must determine if the defendant has established purposeful discrimination. *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 88-89. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. *Purkett*, 514 U.S. at 768, 115 S.Ct. at 1771, 131 L.Ed.2d at 839.

**{¶ 22}** Defendant claims that although the reasons advanced by the prosecutor to support his peremptory strike may have been race-neutral on their face, they were merely a pretext to mask the prosecutor's intent to remove Smith on the basis of race in violation of equal protection. Moreover, defendant claims that the trial court did not proceed to step three of the inquiry and instead stopped after determining that the reasons advanced by the prosecutor were race-neutral. We disagree with both assertions.

**{¶ 23}** In the third part of the *Batson* analysis, the court must decide whether the neutral explanation offered by the proponent of the strike is credible or instead

is a "pretext" for unconstitutional discrimination. *Hernandez*, 500 U.S. at 363, 111 S.Ct. at 1868, 114 L.Ed.2d at 408. This part of the analysis essentially boils down to the credibility of the proponent of the peremptory challenge's race-neutral explanation. *Id.* at 365, 111 S.Ct. at 1869, 114 L.Ed.2d at 409. In this case, the trial court chose to believe the prosecutor's race-neutral explanations for striking prospective juror Smith.

{¶ 24} "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Id.* Because the trial judge's findings in this step " 'largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.' " *Hernandez*, 500 U.S. at 364, 111 S.Ct. at 1869, 114 L.Ed.2d at 409, quoting *Batson* at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21. Thus, we cannot overturn the trial court's finding on the issue of discriminatory intent "unless convinced that its determination was clearly erroneous." *Id.* at 369, 111 S.Ct. at 1871, 114 L.Ed.2d at 412.

{¶ 25} With regard to the cross worn by Smith, personal appearance is frequently upheld as a race-neutral and non-pretextual basis for peremptory strikes. In fact, one court has upheld striking a prospective juror who was wearing a crucifix. See *James v. Commonwealth* (1994), 247 Va. 459, 460-463, 442 S.E.2d 396, 397-398. Other personal-appearance characteristics that have been upheld as race-neutral and non-pretextual have included facial hair (*Purkett v. Elem*, *supra)*, having a muscular build (*Maxey v. State*, [Mar. 19, 1992], Tex. App. No. A14-90-00793-CR, unreported, 1992 WL 49905), wearing flashy clothes (*Stanford v. Commonwealth* [Ky.1990], 793 S.W.2d 112, 114), and chewing gum (*Webb v. State* [Tex.App.1992], 840 S.W.2d 543). In deference to the trial court, who was able to

view the cross in question and observe Smith's demeanor, we find no abuse of discretion.

{¶ 26} The second reason advanced by the prosecutor was that Smith had strongly held religious beliefs. Again, we find no abuse of discretion in finding this to be a race-neutral and non-pretextual basis for the prosecutor's peremptory challenge. Religion is often the foundation for an individual's moral values, so religious beliefs can be an important consideration for both sides in seating an impartial jury. Defendant points out that Smith indicated that he would be able to sit in judgment of others and that he knew right from wrong. But only the trial court was able to determine the sincerity of the effect of these words and whether it was reasonable for the prosecutor to believe otherwise. Even Smith's quickness in pointing out his ability to judge others may have played into the prosecutor's decision to exercise a peremptory challenge to strike him. Again, in deference to the trial court who was able to determine the credibility of the words that we can only see on paper, we find no abuse of discretion in the trial court's finding that this reason was both race-neutral and non-pretextual.

{¶ 27} The third and final reason advanced by the prosecutor as a basis for challenging Smith was his alleged vagueness in answering questions about his religion. Again, the defendant points to Smith's final answer where he identified his church and even pinpointed an address. However, the record shows that before he ultimately volunteered the information, he generically identified himself as "just a christian," and "nondenominational."

{¶ 28} Again, only the trial court was able to listen to Smith's tone of voice, and his inflection, and to observe his mannerisms and overall demeanor and that of the prosecutor. From our vantage point, far removed from the trial and with only a transcript to review, we give great deference to the trial court who was in the best position to make the determination of whether the defendant met his burden of proving purposeful discrimination. While the trial judge could have made more

explicit findings on the record regarding the challenges, we find no abuse of discretion in allowing the state to exercise a peremptory challenge against Smith. Accordingly, we find that defendant's first proposition of law is without merit.

### Other Acts Evidence

{¶ 29} In his fifth proposition of law, defendant alleges that the repeated introduction of bad character evidence to show his propensity to commit the crime charged was so prejudicial as to deny the presumption of innocence and the fundamental fairness of his trial in violation of the Due Process Clause of the Fourteenth Amendment. Defendant claims that the trial court erred in allowing the state to introduce evidence from a prior criminal trial, which resulted in acquittal, as well as evidence of other acts that he allegedly committed. In particular, defendant objects to admission of details about his prior rape charge and other offenses.

{¶ 30} The premise of the defense was that Valerie Parks had a motive to bring false rape charges against defendant. Therefore, at trial, defense counsel brought out details about Parks's knowledge of the prior rape charge brought by his ex-wife. In addition, defense counsel elicited details about defendant's prior conviction for domestic violence.

{¶ 31} Because defense counsel did not object to any of these alleged errors, they are waived absent plain error. Crim.R. 52(B). Defendant acknowledges that defense counsel was the proponent of much of this alleged other acts evidence, but claims that the state went too far in eliciting the details and misused the prior rape charge to show defendant's propensity to commit rape. However, once defendant brought this evidence in and attempted to use it to undermine Parks's credibility, defendant opened the door for the state to refer to it as well. Crim.R. 52(B). The court of appeals described the above evidence as the "crux of Gowdy's defense and had to be offered to support his claim." We agree. Accordingly, defendant's fifth proposition of law is without merit.

**Ineffective Assistance of Counsel**

{¶ 32} In his sixth proposition of law, defendant claims that he was denied the effective assistance of counsel at trial. "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. In addition, to show defendant has been prejudiced by counsel's deficient performance, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.*, paragraph three of the syllabus.

{¶ 33} First, defendant claims that he was denied the effective assistance of counsel when trial counsel allowed a juror who had been the victim of an attempted date rape to remain on the panel. However, as the court of appeals noted, the record reflects that counsel successfully removed from the jury panel a prospective juror who had been the victim of an attempted date rape and who informed counsel that she would not be able to be objective. In addition, counsel exercised a peremptory to excuse another juror whose aunt had been the victim of an attempted rape and who was closely related to a police officer. Trial counsel used her remaining peremptory challenges to excuse a prospective juror who was caring for an elderly relative, and a prospective juror who needed to care for his son.

{¶ 34} As for the prospective juror in question, juror Pearson, when she indicated that she had been the victim of an attempted date rape in 1985, counsel followed up with questions. Juror Pearson acknowledged that no physical contact was made and she informed counsel that she could set aside her personal feelings and could judge the facts in this case fairly. Moreover, the other jurors who remained on the panel all stated that they would be able to set aside their personal feelings and be objective. Based on all of the above, we find that defendant failed

to show that the outcome of the trial would have been different had prospective juror Pearson been excused.

{¶ 35} Second, defendant alleges that defense counsel's strategy of introducing evidence of defendant's prior rape charge at trial amounted to ineffective assistance of counsel. As noted previously, the crux of defendant's defense was that the sexual intercourse was consensual and that Parks, motivated by jealously, was lying. Thus, the evidence that Parks had knowledge of the prior rape charge and used it as retaliation for defendant's breakup was central to defendant's attack on her credibility. We further note that defense counsel's failure to object when the state elicited testimony about the details of the prior charge did not prejudice the defendant. Taken in context with all of the circumstances of this case, we conclude that this did not amount to ineffective assistance of counsel.

{¶ 36} Third, defendant claims that defense counsel was ineffective for failing to object when the state cross-examined defendant about prior charges for domestic violence, no driver's license, and failure to pay child support.

{¶ 37} Defendant, himself, on direct examination, brought up the fact that he had warrants against him. He mentioned both failure to pay child support and domestic violence. On cross-examination, the prosecutor simply asked defendant the basis of the warrants to which he had earlier referred on direct exam. Defendant then explained that one was for failure to pay child support and one was for a probation violation related to his prior domestic violence conviction against his ex-wife. Therefore, the defense had already opened the door to cross-examination on these subjects by bringing them up on direct examination as part of the theory of their defense—that Parks knew about the prior conviction for domestic violence and the prior rape charge, and knew that she could intimidate the defendant into staying with her by threatening to call police regarding the warrants or fabricate her own rape charges against defendant. Therefore, this information was related to the

crux of the defense's case. We find that it was a reasonable tactical decision for defense counsel not to object to cross-examination on these issues.

**{¶ 38}** As for the driver's license, while counsel should have objected to the admission of this evidence, defendant has not demonstrated "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley*, *supra*, at paragraph three of the syllabus. Thus, we conclude that the failure to object to the issues above did not rise to the level of ineffective assistance of counsel.

**{¶ 39}** Finally, defendant alleges that trial counsel was unprepared to go forward with the sexual offender classification hearing. Indeed, counsel *was* unprepared to conduct the sexual offender classification hearing. But that was through no fault of her own. Neither counsel nor defendant received notice of the hearing. Our resolution of the notice issue follows and makes this particular claim moot.

**{¶ 40}** Based on our prior review of the other three claims, we find that defendant's claims did not rise to the level of ineffective assistance of counsel. Accordingly, we find that defendant's sixth proposition of law is without merit.

### Sexual Offender Classification Hearing

**{¶ 41}** R.C. 2950.09(B)(1) provides that "the judge who is to impose sentence upon the offender shall conduct a hearing to determine whether the offender is a sexual predator. The judge shall conduct the hearing prior to sentencing and, if the sexually oriented offense is a felony, may conduct it as part of the sentencing hearing required by section 2929.19 of the Revised Code. The court shall give the offender and the prosecutor who prosecuted the offender for the sexually oriented offense notice of the date, time, and location of the hearing." R.C. 2950.09(B)(1).

**{¶ 42}** When defendant was convicted on April 28, 1997, the trial judge set the sentencing hearing for May 9, 1997, without any mention of a sexual offender

classification hearing. On May 9, 1997, defendant and his counsel and the prosecutor were present for sentencing when trial counsel made a motion to withdraw from further representation because defendant had written a letter to the trial judge after his conviction, accusing trial counsel of ineffectiveness. The trial court denied her motion, and she was forced to proceed with both sentencing and then the sexual offender classification hearing.

{¶ 43} The court of appeals determined that the trial court erred in failing to give the notice required by R.C. 2950.09(B)(1), but concluded that there was no prejudice to defendant from the lack of notice. We strongly disagree and reverse the judgment of the court of appeals on this issue.

{¶ 44} Defendant received no notice of the hearing, either orally or in writing. Clearly, defendant did not receive that which was due to him under the statute. Trial counsel did her best to represent defendant at the sexual offender classification hearing within the constraints upon her; however, we find that it is imperative that counsel have time to adequately prepare for the hearing. At the hearing, the defendant is entitled to "testify, present evidence, call and examine witnesses and expert witnesses, and cross-examine witnesses and expert witnesses regarding the determination as to whether the offender is a sexual predator." R.C. 2950.09(B)(1).

{¶ 45} At a sexual offender classification hearing, decisions are made regarding classification, registration, and notification that will have a profound impact on a defendant's life. Defendants must have notice of the hearing in order to "have an opportunity to testify, present evidence, call and examine witnesses and expert witnesses, and cross-examine witnesses and expert witnesses regarding the determination as to whether the offender is a sexual predator." R.C. 2950.09(B)(1).

{¶ 46} R.C. 2950.09(B)(1) further provides that "[t]he court shall give the offender and the prosecutor who prosecuted the offender for the sexually oriented offense notice of the date, time, and location of the hearing." Giving effect to the

16

plain language of the statute, we conclude that the notice provision of R.C. 2950.09(B)(1) demands strict compliance. To hold otherwise would make the hearing perfunctory in nature and would deny defendant the rights guaranteed him under the statute.

{¶ 47} Defense counsel did not formally object to the judge's proceeding with the hearing without notice to the defendant. We are mindful that we have held that sexual offender classification hearings under R.C. 2950.09(B) are civil in nature, *State v. Cook* (1998), 83 Ohio St.3d 404, 423, 700 N.E.2d 570, 585. "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099, syllabus. We find that this case involves such exceptional circumstances and therefore hold that this lack of notice to the defendant constituted plain error.

{¶ 48} Accordingly, we hold that the notice requirement for sexual offender classification hearings under R.C. 2950.09(B)(1) is mandatory. Notice of the sentencing hearing is not sufficient notice of the sexual offender classification hearing. Absent compliance with the mandatory notice provision, defendant's classification as a sexual predator must be vacated and the matter remanded to the trial court for a sexual offender classification hearing with proper advance notice of the hearing issued to the parties. The remainder of the judgment of the court of appeals is affirmed.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

MOYER, C.J., RESNICK, F.E. SWEENEY AND PFEIFER, JJ., concur.

DOUGLAS, J., concurs in judgment.

COOK, J., dissents.

——————————————

**COOK, J., dissenting.**

{¶ 49} I agree with the majority that the trial court's failure to satisfy the notice requirement for the sexual offender classification hearing was error. Gowdy, however, did not object to this error. The majority decides, without elaboration, that this case involves "exceptional circumstances" and reverses on the basis of plain error. I respectfully dissent, because I would find no plain error here.

{¶ 50} At least two appellate districts in this state have determined that plain error does not necessarily occur whenever a trial court fails to provide proper notice of the classification hearing under R.C. 2950.09. See, *e.g.*, *State v. Meade* (Apr. 30, 1999), Scioto App. No. 98CA2566, unreported, 1999 WL 299890; *State v. Martell* (Nov. 29, 1999), Clermont App. Nos. CA99-01-009 and CA99-05-054, unreported, 1999 WL 1087025. Both courts adhered to the well-established prudential rule that "[n]otice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus.

{¶ 51} In *Meade*, the offender pleaded guilty to rape, and the trial court held the sexual predator classification hearing just before the sentencing hearing without objection from either party. On appeal, Meade argued that the trial court deprived him of due process by failing to notify him that the classification hearing would occur at sentencing. The court of appeals found no plain error, noting that Meade expressed no surprise or confusion when the court began the classification hearing, and that Meade's counsel presented evidence on Meade's behalf that dovetailed the factors enumerated in R.C. 2950.09(B)(2). Accordingly, the court of appeals

concluded that the failure to provide specific notice of the classification hearing did not prejudice Meade.

{¶ 52} In *Martell*, the offender pleaded guilty to rape and gross sexual imposition. At the conclusion of the sentencing hearing, the prosecutor said to the judge, "Wait, Your Honor, there is the issue of classification, I guess, before—if we can do that at this time. * * * My understanding from [defense counsel] is that there is not going to be an argument on that." Defense counsel then said to the judge, "We are not going to stipulate to it. We think all the information necessary * * * is before the Court. We concede 'sexually oriented offender' would not be appropriate. We think the middle classification would be appropriate." The state urged the court to classify Martell as a sexual predator, and defense counsel discussed Martell's remorse. The court classified Martell as a sexual predator.

{¶ 53} On appeal, Martell argued that the trial court's failure to notify him that the sexual predator classification would occur at sentencing denied him due process. Like the *Meade* court, the Twelfth Appellate District determined that the notice error did not prejudice Martell. The court reasoned that Martell's counsel knew the classification hearing would occur at sentencing, since he had previously discussed the classification issue with the prosecutor. And Martell's counsel advocated the interests of his client by noting Martell's remorse and suggesting the appropriateness of the "middle" classification. For these reasons, the court of appeals concluded that the notice failure did not amount to plain error.

{¶ 54} Both the *Meade* and *Martell* courts applied the definition of "plain error" from Crim.R. 52(B). Today, the majority applies the *civil* definition of "plain error" from *Goldfuss v. Davidson*, noting that our decision in *State v. Cook* held that sexual predator classification hearings are "civil in nature." Regardless, *Goldfuss* expressly found that the plain error doctrine "originated as a criminal law concept," *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 121, 679 N.E.2d 1099, 1103. And *Goldfuss's* definition of the plain error standard to be applied in civil

contexts tracks the standard in our criminal cases interpreting Crim.R. 52(B). Compare *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus ("Notice of plain error under Crim.R. 52[B] is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."), and *Goldfuss, supra,* 79 Ohio St.3d at 121, 679 N.E.2d at 1103 ("In applying the doctrine of plain error in a civil case, reviewing courts must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings."). Finally, even in *Cook*, we cited *criminal* cases to support our conclusion that the trial judge's reliance on a presentence report during the classification hearing did not amount to plain error. *State v. Cook* (1998), 83 Ohio St.3d 404, 426, 700 N.E.2d 570, 587, citing *State v. Nicholas* (1993), 66 Ohio St.3d 431, 435-436, 613 N.E.2d 225, 229, and *State v. Martin* (1955), 164 Ohio St. 54, 59, 57 O.O. 84, 87, 128 N.E.2d 7, 12. All of this persuades me that the *Meade* and *Martell* courts properly employed the Rule 52(B) standard for plain error.

{¶ 55} The record of the sentencing proceeding in this case reveals that Gowdy did not suffer prejudice as a result of the trial court's failure to comply with the notice requirement of R.C. 2950.09. Gowdy's trial counsel appeared with Gowdy at his sentencing hearing, and they expressed no surprise that the classification hearing would occur before sentencing. When Gowdy's attorney requested to withdraw as Gowdy's counsel, she did so on the basis of her client's *pro se* motion alleging ineffective assistance of counsel—not because she felt unprepared to represent Gowdy during the classification hearing. When the trial court denied defense counsel's request to withdraw, based on her demonstrated history of effective representation, the parties—like the parties in *Meade* and

*Martell*—presented arguments that dovetailed appropriate factors for consideration under R.C. 2950.09(B)(2). Defense counsel urged the court to consider Gowdy's lack of prior felony convictions. See R.C. 2950.09(B)(2)(b) and (f). And the state noted Gowdy's prior criminal record, the nature of the offense, Gowdy's demonstrated pattern of abuse, and evidence of cruelty. See R.C. 2950.09(B)(2)(b), (f), (h), and (i). Only after considering these statutorily permissible factors did the trial court classify Gowdy as a sexual predator.

{¶ 56} Because I do not believe that the trial court's improper notice prejudiced Gowdy, I would not vacate his classification as a sexual predator on the basis of plain error. This is not "the extremely rare case involving exceptional circumstances" where the trial court's error challenges the legitimacy of the judicial process. *Goldfuss, supra,* 79 Ohio St.3d 116, 679 N.E.2d 1099, syllabus. And because I concur with the majority's disposition of Gowdy's other claims, I would affirm the judgment of the court of appeals.

———————————