[Cite as *State v. Singer*, 2019-Ohio-1922.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-17-1309

        Appellee                                 Trial Court No. CR0201701494

v.

Terrence L. Singer                               **DECISION AND JUDGMENT**

        Appellant                                Decided:  May 17, 2019

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Alyssa Breyman, Assistant Prosecuting Attorney, for appellee.

Karin L. Coble, for appellant.

* * * * *

**ZMUDA, J.**

## I.  Introduction

{¶ 1} Appellant, Terrence Singer, appeals the judgment of the Lucas County Court

of Common Pleas, sentencing him to 20 years to life in prison after a jury found him

guilty of murder.  Finding prejudicial error in the proceedings below, we reverse.

## A. Facts and Procedural Background

{¶ 2} On March 15, 2017, appellant was indicted on one count of murder in violation of R.C. 2903.02(B) and R.C. 2929.02, an unspecified felony, and one count of aggravated robbery in violation of R.C. 2911.01(A)(1) and (C), a felony of the first degree. Additionally, the indictment contained repeat violent offender specifications attached to each count under R.C. 2941.149.

{¶ 3} On March 22, 2017, appellant entered a plea of not guilty by reason of insanity, and requested a bill of particulars along with discovery. Thereafter, the trial court held a hearing on appellant's insanity plea, during which a Court Diagnostic and Treatment report was admitted into evidence. At appellant's request, the trial court referred him to Central Behavioral Healthcare for a second evaluation under R.C. 2945.371(G)(4). Following the completion of the second evaluation, appellant withdrew his insanity plea and entered a plea of not guilty.

{¶ 4} On July 6, 2017, the state provided appellant with a bill of particulars, in which the state asserted that appellant stabbed the victim, Thomas Cauley, in the chest with a large butcher knife, causing serious injuries to which Cauley eventually succumbed. The state further asserted that appellant took property from Cauley following the stabbing. The bill of particulars explained that Cauley's death was the proximate result of appellant's commission of felonious assault in violation of R.C. 2903.11(A)(2), and therefore amounted to felony murder under R.C. 2903.02(B).

2.

Moreover, the bill of particulars referenced appellant's April 29, 2005 conviction for aggravated robbery in support of the repeat violent offender specifications.[1]

{¶ 5} Following the completion of pretrial discovery, the matter proceeded to a two-day jury trial.[2] During voir dire, an issue arose concerning the state's election to use one of its peremptory challenges to strike the only African-American juror, juror No. 5, from the venire, which prompted the following discussion:

> [DEFENSE COUNSEL]: You Honor, we would challenge that based on *Batson*. She's the only African American on the panel and Mr. Singer is an African American.
>
> THE COURT: [Prosecutor?]
>
> [PROSECUTOR]: Judge, I don't know whether or not she's African-American or not. Her complexion is certainly not that that's absolutely definitive. Regardless, the State is excusing her because of her age.
>
> THE COURT: Okay.

---

[1] The bill of particulars was later amended to include a reference to appellant's conviction for attempted robbery from January 1993.

[2] Prior to trial, on August 7, 2017, appellant was indicted on one count of intimidation of a witness in violation of R.C. 2921.03(A) and (B), a felony of the third degree, in case No. CR0201702350. That case was joined with the present case for purposes of trial. The intimidation charge was subsequently dismissed by the trial court at the close of the state's case-in-chief under Crim.R. 29.

3.

[DEFENSE COUNSEL]: Your Honor, I don't believe there [were] any questions regarding her age.

[PROSECUTOR]: It's pretty obvious that she's very young.

THE COURT: Well, then whether she's African-American or not, might be open to some debate, but it appears that perhaps she's a light-skinned African-American. [Defense counsel is] correct that there was not a direct question regarding her age, but she certainly looks to all appearances as if she's on the younger age of the spectrum or younger side of the spectrum. Do you have any other – and Mr. Singer is an African-American gentleman. So they are of the same race.

Any other reason you can provide to the court for that strike other than her apparent youthful appearance?

[PROSECUTOR]: I think her youthful appearance is more apparent than her race and in this particular matter, the color hair, her youthful appearance and her seemingly lack of education based upon her employment as a custodian at [the University of Toledo Medical Center] are all race neutral reasons for excusing [juror No. 5].

[DEFENSE COUNSEL]: Judge, I would just indicate, you know, her occupation has nothing to do with her level of education, even though she might appear to be young. There are a lot of people with college degrees that are working in janitorial positions nowadays due to the

economy. She was asked no questions. She's qualified to be a juror, she was obviously old enough to be on the voting rolls to be selected for jury.

THE COURT: Uh-huh. Okay. Thank you. Well, the court's certainly reviewed *Batson* and aware of the test. It does appear that as I said [juror No. 5] is perhaps at some degree African-American. Again, she's a lighter-skinned young lady.

I don't believe we have any other African-Americans currently on the panel. However, the gallery, we still have at least one or two.

\* \* \*

THE COURT: So I have not yet seen any pattern of dismissal of African-American jurors. I don't detect any bad faith or any other untoward basis for [the prosecutor's] peremptory excusal of [juror No. 5] so I'm going to overrule the *Batson* challenge and [juror no. 5] will be excused.

{¶ 6} After the court overruled appellant's *Batson* challenge, the matter proceeded through voir dire and into the state's presentation of evidence. At the conclusion of the trial, the jury found appellant guilty of murder. The trial court received arguments relevant to the repeat violent offender specification, and ultimately concluded that the repeat violent specification was established based upon the prior offenses of violence appellant had committed over the preceding 20 years. Thereafter, the matter proceeded to sentencing, at which the trial court imposed a prison sentence of 15 years to life on the

5.

murder charge, as well as a five-year sentence on the repeat violent offender specification, to be served consecutive to the murder sentence, for a total prison sentence of 20 years to life.

## B. Assignments of Error

{¶ 7} Following his conviction, appellant entered a timely notice of appeal. On appeal, appellant assigns the following errors for our review:

Assignment of Error One: The trial court erred in overruling appellant's *Batson* challenge to the State's peremptory dismissal of the only African-American juror on the panel.

Assignment of Error Two: The trial court erred in refusing to give jury instructions on the lesser-included offense of voluntary manslaughter.

Assignment of Error Three: Trial counsel rendered ineffective assistance in failing to request a self-defense instruction as the "castle doctrine" applied.

Assignment of Error Four: Appellant's conviction is against the manifest weight of the evidence, and appellant is entitled to a new trial.

## II. Analysis

{¶ 8} In his first assignment of error, appellant argues that the trial court erred in permitting the state to use one of its peremptory challenges to strike juror No. 5, the only African-American juror on the venire.

{¶ 9} In 1875, Congress prohibited the race-based exclusion of any qualified citizen from jury service. *See* Act of Mar. 1, 1875, ch. 114, Section 4, 18 Stat. 336

6.

(codified as amended at Section 243, Title 18, U.S. Code [1948]). Four years later, the Supreme Court of the United States held that a state statute excluding African-Americans from jury service violated a defendant's right to equal protection. *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879). Over time, the court continued to issue decisions directed at "[eradicating racial discrimination in the procedures used to select the venire from which individual jurors are drawn." *Batson v. Kentucky*, 476 U.S. 79, 85, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

{¶ 10} Despite the court's attempts to address discrimination in the selection of the venire, "prospective African-American jurors continued to be excluded from [petit] jury panels through the use of peremptory challenges." *State v. Gowdy*, 88 Ohio St.3d 387, 391, 727 N.E.2d 579 (2000), citing *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed. 2d 759 (1965). Thus, in 1986, the court issued its decision in *Batson*, which applied the principles annunciated by the court regarding the selection of the venire to the selection of the petit jury. *Batson* at 88. In so doing, the court directed that "the State may not draw up its jury lists pursuant to neutral procedures but then resort to discrimination at 'other stages in the selection process.'" *Id.*, quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 97 L.Ed. 1244 (1953). The court went on to hold that the Equal Protection Clause forbids prosecutors from challenging potential jurors solely on account of their race or on the assumption that African-American jurors as a group will be unable to impartially consider the state's case against an African-American defendant. *Id.* at 89.

7.

{¶ 11} In *Batson*, the Supreme Court of the United States overruled its decision in *Swain*, and held that racial discrimination in jury selection is prohibited.[3] In *Batson*, the court articulated a three-step analysis to be applied in determining whether the exercise of a peremptory challenge was racially motivated. The Ohio Supreme Court applied this analysis in *Hicks v. Westinghouse Materials Co.*, 78 Ohio St.3d 95, 676 N.E.2d 872 (1997).

{¶ 12} Under this analysis, the party opposing the peremptory challenge must first demonstrate a prima facie case of racial discrimination in the use of the strike. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 50, citing *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 106. To do this, the party must show that he is a member of a cognizable racial group, that the peremptory challenge will remove a member of his race from the venire, and that there is an inference of racial discrimination. *Hicks* at 98. In determining whether a prima facie case exists, the trial court must consider all relevant circumstances, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members has been exhibited. *Id.*

{¶ 13} Once the challenging party demonstrates a prima facie case of racial discrimination, the burden shifts to the state in step two of the analysis, which requires

---

[3] The Supreme Court of the United States later extended *Batson* and held that the Equal Protection Clause forbids intentional discrimination in the exercise of peremptory challenges on the basis of gender. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

8.

the state to articulate a race neutral explanation related to the case for striking the potential juror. *Id.* Although the state's explanation "'need not rise to the level justifying exercise of a challenge for cause,'" a simple affirmation of good faith is not sufficient. *Thompson* at ¶ 51, quoting *Batson* at 97. If an affirmation of good faith were deemed acceptable in these cases, "the Equal Protection Clause 'would be but a vain and illusory requirement.'" *Batson* at 98, quoting *Norris v. Alabama*, 294 U.S. 587, 598, 55 S.Ct. 579, 79 L.Ed. 1074 (1935). Ultimately, "[t]he critical issue is whether discriminatory intent is inherent in counsel's use of the strike and that the explanation is merely a pretext for excluding the potential juror on the basis of race." *State v. Swain*, 6th Dist. Erie No. E-12-079, 2014-Ohio-1308, ¶ 18, citing *Hicks* at 98.

{¶ 14} If the striking party articulates a race neutral explanation for striking the potential juror, the third-step demands that the trial court "determine whether the party opposing the peremptory strike has proved purposeful discrimination." *Hicks* at 98. In making its determination, the trial court must examine the persuasiveness and credibility of the justification offered by the striking party. *Swain* at ¶ 19. "The critical question is whether counsel's race-neutral explanation should be believed." *Id.*, citing *Hicks* at 98. "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

{¶ 15} The record in this case reveals that both appellant and juror No. 5 are African-American. The trial court recognized this fact, requested the state to provide

9.

race neutral reasons for exercising its peremptory challenge, and proceeded to determine whether appellant's *Batson* challenge was meritorious. In similar situations, courts have held:

> [I]t is not necessary to determine the first question of whether defendant made a prima facie showing of racial discrimination when a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination. In that circumstance, the preliminary issue of whether the defendant had made a prima facie showing becomes moot. *State v. Ford*, 10th Dist. Franklin No. 07AP-803, 2008-Ohio-4373, ¶ 79, citing *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

{¶ 16} Because the trial court ruled on the ultimate issue of discrimination in this case, the issue of whether appellant has made a prima facie showing of racial discrimination is moot. Thus, we will move directly to an examination of the race neutral bases articulated by the state.

{¶ 17} In evaluating race neutrality in step two of the *Batson* analysis, we assume the proffered reasons for the peremptory challenge are true, and consider whether such reasons violate the Equal Protection Clause as a matter of law. *Hernandez* at 359. "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent

10.

in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 360. Notably, the second step of the *Batson* test "does not demand an explanation that is persuasive, or even plausible." *Purkett* at 768.

{¶ 18} The race neutral reasons offered by the state to support its peremptory challenge in this case were two-fold. First, the state asserted that it was excusing juror No. 5 because of her age. Second, the state claimed, upon further questioning by the trial court, that its peremptory challenge was motivated by juror No. 5's apparent lack of education. Age and education are race neutral elements and are not inherently discriminatory.[4] Indeed, the terms youthful and uneducated describe both African-Americans and non-African-Americans. Assuming, as we must at this step of the analysis, that the state was being truthful in asserting that youth and lack of education formed the basis for its peremptory challenge, we find that the state has articulated a race neutral explanation for striking juror No. 5. Consequently, we will move to the third and final step in the *Batson* inquiry.

{¶ 19} "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best

---

[4] The state also referenced the color of juror No. 5's hair when asked about the basis of its peremptory challenge. It is unclear from the record whether the color of juror No. 5's hair was a standalone reason offered by the state to support its peremptory challenge. It appears from the record that hair color was used to support the state's assumption that juror No. 5 was "very young." In any event, the state's reference to juror No. 5's hair color does not alter our analysis.

11.

evidence often will be the demeanor of the attorney who exercises the challenge." *Hernandez*, *supra*, 500 U.S. at 365, 111 S.Ct. 1859, 114 L.Ed.2d 395. Because the trial judge's findings in this step "'largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.'" *Id.*, quoting *Batson*, *supra*, 476 U.S. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69, fn. 21. Thus, we cannot overturn the trial court's finding on the issue of discriminatory intent without a showing of clear error. *Gowdy*, *supra*, 88 Ohio St.3d at 394, 727 N.E.2d 579, citing *Hernandez* at 369.

{¶ 20} In this case, the trial court, in rejecting appellant's *Batson* challenge under step three, made two findings. First, the court indicated that it had "not yet seen any pattern of dismissal of African-American jurors." Second, the trial court indicated that it did not sense any bad faith or "untoward basis" for the state's peremptory excusal of juror No. 5.

{¶ 21} On the issue of pattern under the first step of the *Batson* test, we have previously held that "the defendant is not required to present evidence of a 'systematic pattern of peremptory strikes against minorities.'" *State v. Swain*, 6th Dist. Erie Nos. E-11-087, E-11-088, 2013-Ohio-5900, ¶ 81, quoting *State v. Graves*, 6th Dist. Lucas No. L-02-1053, 2003-Ohio-2359, ¶ 45. Our holding in *Swain* echoes the words of the Supreme Court of Ohio, which has stated: "The existence of a pattern of discriminatory strikes is not a prerequisite either to finding a prima facie case in step one of the *Batson* analysis or to finding actual discrimination in step three." *State v. White*, 85 Ohio St.3d 433, 436, 709 N.E.2d 140 (1999). The court in *White* went on to state the inevitable result of a rule that would require the demonstration of a pattern of discriminatory strikes as a

12.

prerequisite to a successful *Batson* challenge: "Such a rule would license prosecutors to exercise one illegal peremptory strike per trial. The law of equal protection does not allow 'one free bite.'" *Id.*

{¶ 22} The foregoing authority establishes the error in the trial court's reliance on the absence of a pattern of peremptory strikes against African-Americans in this case. This error is further elucidated by the fact that juror No. 5 was the only African-American on the venire. Thus, a pattern of striking African-American jurors from the venire could not be established in this case. Moreover, it is worth noting that juror No. 5 was the *first* juror to be subject to a peremptory challenge in this case. This additional fact further supports our conclusion that the trial court's reliance on pattern was clearly erroneous in this case. The establishment of a pattern of discrimination with respect to peremptory challenges was logically impossible at this point because only one challenge had been used. Therefore, the trial court's first finding was clearly erroneous.

{¶ 23} Next, we turn to the trial court's determination that the prosecutor exercised his peremptory challenge in good faith and without an "untoward basis." In essence, the trial court found that the prosecutor's race-neutral references to age and lack of education were believable and, thus, that appellant had failed to demonstrate the explanation was merely pretextual and therefore discriminatory. Having reviewed the record in its entirety, and mindful of the deference generally afforded to the trial court's *Batson* determination, we nonetheless disagree with the trial court's finding concerning appellant's proof of discrimination.

13.

{¶ 24} In *Ex parte Branch*, 526 So.2d 609 (Ala.1987), the Supreme Court of Alabama examined *Batson* and articulated "the procedures that [it believed] must be followed to implement [*Batson*], the specific role of the trial judge in the process, and the scope of appellate review of the trial court's determination." *Id.* at 616. Relevant here, the court in *Branch* set forth the following factors that can be used to demonstrate that counsel's race-neutral reasons for exercising a peremptory challenge of an African-American juror are merely sham or pretext:

> 1. The reasons given are not related to the facts of the case.
>
> 2. There was a lack of questioning to the challenged juror, or a lack of meaningful questions.
>
> 3. Disparate treatment – persons with the same or similar characteristics as the challenged juror were not struck.
>
> 4. Disparate examination of members of the venire; e.g., a question designed to provoke a certain response that is likely to disqualify the juror was asked to black jurors, but not to white jurors.
>
> 5. The prosecutor, having 6 peremptory challenges, used 2 to remove the only 2 blacks remaining on the venire.
>
> 6. An explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically. For instance, an assumption that teachers as a class are too liberal, without any specific

questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror. (Citations omitted.)

*Id.* at 624.

{¶ 25} While the foregoing list is not binding on this court, having been articulated by a court of another state, we nonetheless find it useful in guiding the court's evaluation of whether the race neutral reasons for striking juror No. 5 are pretextual. Indeed, this list is the most succinct articulation we have found of what factors should be considered by a trial court under the third prong of the *Batson* test. Thus, we will apply this list to the facts of this case.

{¶ 26} We consider the *Branch* factors above in their totality – therefore, no individual *Branch* factor is dispositive. Moreover, the list of factors set forth in *Branch* should not be construed to be exhaustive. Rather, these factors are illustrative of the considerations that apply when evaluating a *Batson* claim under the third prong.

{¶ 27} Our application of these factors appropriately balances our obligation to conduct a meaningful review of the trial court's *Batson* determination, while still affording the trial court the deference to which it is entitled in these cases.

{¶ 28} Under the first *Branch* factor, we consider whether age and lack of education are related to the facts of this case. Relatedly, under the sixth *Branch* factor, we consider the explanation provided by the prosecutor is support of his decision to strike juror No. 5.

{¶ 29} The first and sixth *Branch* factors are difficult to analyze in this case, primarily because the prosecutor did not articulate how juror No. 5's youthfulness or

15.

apparent lack of education impacted her ability to serve as a juror during the ensuing trial. The Supreme Court of the United States in *Batson* addressed this issue when it stated that "the prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges," and further directed that the prosecutor's explanation must be "related to the particular case to be tried." *Batson*, *supra*, 476 U.S. at 88, 106 S.Ct. 1712, 90 L.Ed.2d 69, fn. 20, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

{¶ 30} Here, the prosecutor failed to provide any explanation as to why this case required a juror with a certain degree of education or maturity. Further, the prosecutor did not explore whether juror No. 5 possessed the group traits he associated with youthfulness and lack of education. In that regard, this case is factually distinguishable from the Supreme Court of Ohio's decision in *Hicks*, *supra*. There, the peremptory challenge of an African-American juror on the basis of a lack of education was permitted after the trial judge directed counsel to explain their reasons for the peremptory challenge. Counsel reasoned that the challenged juror

> is an unemployed woman who has a very limited educational background. This is a case that involves some technical issues and medical testimony. We're concerned by the answers that we received yesterday that those issues require a certain level of education, a certain level of sophistication that may not be present in this particular juror.

*Hicks*, 78 Ohio St.3d at 96, 676 N.E.2d 872.

{¶ 31} On appeal to the Supreme Court of Ohio, the court affirmed the trial court's decision and found that counsel's race-neutral concern about the juror's ability to understand the complexities of the case was supported by the juror's responses to questions posed during voir dire and her educational background. *Id*. at 100.

{¶ 32} Under the second *Branch* factor, we consider the substance and quantity of questions posed to juror No. 5 by the state. During voir dire, the prosecutor asked juror No. 5 only one question, namely whether she had a problem with the fact that the state did not have to prove appellant's motive in order to establish his guilt. Juror No. 5 responded in the negative, indicating that she did not take issue with the legal principle enunciated by the state. The prosecutor did not follow up with juror No. 5, nor did he inquire into her age or her level of education. Moreover, appellant did not ask juror No. 5 any questions. Thus, juror No. 5's employment as a custodian for the University of Toledo Medical Center (which was brought to light by the trial court's questioning of juror No. 5) was the only information that was before the state at the time that it exercised its peremptory challenge.

{¶ 33} Notably, juror No. 5's position as a custodian may indicate a lack of advanced education, but it does not conclusively establish that fact. Working as a custodian does not automatically translate into a lack of education, nor does it demonstrate that one lacks a college degree. With no other educational information before him, it stands to reason that the prosecutor would have probed further into juror

17.

No. 5's educational history if he were truly concerned about a lack of education on the jury. He failed to do so. On this record, we find that there was a lack of meaningful questions asked of juror No. 5 by the state, a fact that suggests pretext.

{¶ 34} Next, we consider the third *Branch* factor, whether juror No. 5 was treated differently than others with the same or similar characteristics who were not struck by the state. Our review of the voir dire reveals that the state exercised four peremptory challenges in this case, including the challenge to juror No. 5. In addition to juror No. 5, the state struck an attorney, a salesperson, and an individual who reported that she cleans doctor's offices. Based upon the state's implicit linkage between occupation and education, it is peculiar that certain other jurors were not challenged by the state. For example, the jury that was ultimately empaneled included a carpenter, a receptionist, a mechanic, an equipment operator, and an office assistant. Generally speaking, none of these occupations require a college degree or advanced education. At first blush, which is the only level of inquiry conducted by the state on the issue of education, it would seem that these jurors have attained an educational level equivalent to juror No. 5, yet they were empaneled and allowed to participate at trial.

{¶ 35} We also question the sincerity of the state's concern about the age of juror No. 5. Indeed, no questions about age were asked of any juror, and no information indicative of age was provided for at least eight of the 14 jurors that were selected, a fact that suggests that the state was not truly concerned about age in this case. Viewed in this light, such disparate treatment further suggests that the state's asserted concern regarding education was merely a pretext.

18.

{¶ 36} Under the fourth *Branch* factor, we examine whether the prosecutor disparately examined the members of the venire by asking questions designed to provoke a disqualifying response from African-American jurors, while not asking those questions to white jurors. As already noted, juror No. 5 was asked only one question by the prosecutor during voir dire, which was whether she could find appellant guilty without the state establishing appellant's motive. That same question was posed to other jurors as well. Consequently, we find that the prosecutor did not disparately examine the members of the venire along racial lines as contemplated in number four above.

{¶ 37} Turning to the fifth *Branch* factor, we note that the prosecutor used one of his four peremptory challenges to strike the only African-American on the venire.

{¶ 38} Having applied the six *Branch* factors to the case sub judice, we find the record demonstrates that the prosecutor's race-neutral reasons for striking juror No. 5, namely age and lack of education, were merely pretexts used by the state to justify its otherwise discriminatory peremptory challenge of juror No. 5. If age and education were important considerations for the prosecutor here, it stands to reason that he would have conducted some inquiry into those issues, particularly with juror No. 5. In *State v. Manns*, 169 Ohio App.3d 687, 2006-Ohio-5802, 864 N.E.2d 657 (2d Dist.), the Second District conducted a *Batson* analysis and emphasized that "[t]he State of Ohio must be scrupulous in building a record which legitimately demonstrates their articulated concern" regarding a stricken juror. *Id.* at ¶ 50. No such record was made in this case.

19.

{¶ 39} In *State v. Singfield*, 9th Dist. Summit No. 16253, 1994 Ohio App. LEXIS 336 (Jan. 26, 1994), the prosecutor exercised a peremptory challenge to strike an African-American female from the jury, allegedly because she had no children and managed a pharmacy. The appellate court found these reasons to be pretexts, noting that four of the Caucasian jurors that were impaneled had children, and rejecting the sincerity of the prosecutor's occupational reason because the "prosecutor did not attempt to specify how [managing a pharmacy] could detrimentally influence the excluded venireperson regarding the state's case." *Id.* at *11. The Ninth District went on to state: "While we realize that it may be burdensome for a prosecutor to specifically articulate legitimate, race-neutral reasons that are particular to the case which is to be tried when peremptorily challenging minority venirepersons, we believe that such an explanation is what is required in response to a challenge based on *Batson* and its progeny." *Id.*

{¶ 40} Similar to the prosecutor in *Singfield*, the prosecutor here not only failed to conduct an inquiry into juror No. 5's age and education, he also failed to provide any explanation as to how age and education were even relevant to the jury selection process in this case. On these facts, we find that the trial court clearly erred when it found that appellant did not meet his burden in proving a *Batson* violation.

{¶ 41} Accordingly, appellant's first assignment of error is well-taken. Because our findings with respect to appellant's first assignment of error require this matter to be remanded to the trial court for a new trial, appellant's remaining assignments of error are moot.

20.

### III. Conclusion

{¶ 42} In light of the foregoing, the judgment of the Lucas County Court of Common Pleas, is hereby reversed, and this matter is remanded to the trial court for a new trial. The state is to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowsk, J.

_____
JUDGE

Arlene Singer, J.

_____
JUDGE

Gene A. Zmuda, J.
CONCUR.

_____
JUDGE