[Cite as *State v. Mitchell*, 2016-Ohio-1439.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 14 MA 0119 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| JANERO MITCHELL, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:   Criminal Appeal from the Court of
Common Pleas of Mahoning County,
Ohio
Case No. 2012 CR 1233

JUDGMENT:                   Affirmed.

APPEARANCES:

For Plaintiff-Appellee:      Atty. Ralph M. Rivera
Assistant Prosecuting Attorney
21 West Boardman St., 6th Floor
Youngstown, Ohio 44503

For Defendant-Appellant:     Atty. Carrie E. Wood
Assistant State Public Defender
Office Of The Ohio Public Defender
250 E. Broad Street, Suite 1400
Columbus, Ohio 43215

JUDGES:

Hon. Carol Ann Robb
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

Dated:  March 30, 2016

ROBB, J.

{¶1} Defendant-Appellant Janero Mitchell appeals after being convicted of aggravated murder with a firearm specification in the Mahoning County Common Pleas Court. Appellant contests the state's use of a peremptory challenge to excuse an African-American from the jury. He next states that he was denied a fair trial when the jury heard testimony about a threat to a witness. He also contests the admissibility of a detective's testimony about a tip. As to the latter two arguments, Appellant adds ineffective assistance of counsel arguments. For the following reasons, the trial court's judgment is upheld.

STATEMENT OF THE CASE

{¶2} Around noon on October 17, 2012, Mark Haskins was shot four times near the corner of Bissell and Kensington Avenues on the north side of Youngstown. He died three days later. Just prior to the shooting, the victim called 911. Before the dispatcher spoke, the victim could be heard refusing to get in someone's car. He then reported to the dispatcher that "somebody jumped on" him at the corner of Kensington and Bissell. Another man could be heard yelling in the background to which the victim responded, "I didn't steal nothing." The man in the background replied by yelling something about "falsifying" and "we want to report a robbery." The call then disconnected.

{¶3} Minutes later, a witness heard multiple gunshots as she was raking leaves. She turned in time to see the victim fall from a large rock onto the sidewalk in front of a nearby house. The shooter fired two to three more times as the victim rolled from the sidewalk to the grass. (Tr. 285). The shooter turned to leave but then turned back and fired one last shot at the victim. (Tr. 286). The witness estimated 7-9 shots were fired. (Tr. 285, 289). One of the bullets passed over her head and hit her house. (Tr. 294). She said the shooter looked at her before he got into the driver's side of a green vehicle parked at the scene. (Tr. 297).

{¶4} While the witness ran inside to call 911, the victim called 911 a second time; he can be heard moaning on the recording. (Tr. 288, 522). A different woman, who was also out raking leaves, called 911 and reported seeing a gold SUV speed

down the street after hearing the gunshots. (Tr. 526). This woman had difficulty with colors due to recent brain surgery. (Tr. 527). Another woman was driving by when she heard gunfire, which prompted her to stop her car and duck. After the shooting, she spotted the victim on the ground and saw a man enter a large green truck and drive away from the scene. (Tr. 431-432).

{¶5} While emergency medical personnel treated the victim, he became briefly responsive. (Tr. 517, 640, 642). A police officer asked about the shooter and the vehicle. The victim described the vehicle as a green truck. (Tr. 640, 650). The victim could not or would not report who shot him; the officer's report stated that the victim said he did not know who shot him, but the officer testified at trial the victim would not provide a name and answered "no" when asked who shot him. (Tr. 641-642, 648-649).

{¶6} Police collected eight .40 caliber shell casings from the scene. (Tr. 390). Testing established that they were all fired from the same firearm. (Tr. 475). A slug was recovered from the siding on the witness's house. (Tr. 392). Bullet strikes could be seen on the rock and the sidewalk.

{¶7} The main witness was transported to the police station to be interviewed by Detective Martin. She testified at trial, and her October 17, 2012 video statement was played to the jury. She called the shooter's green vehicle a truck but also described it as a SUV, which she said was similar to a Jeep SUV she saw parked at the police station. (Tr. 287). She believed the shooter's vehicle had silver and black molding running down the doors. (Tr. 306-307). On the topic of colors, she said she had no problem discerning the color green but had difficulty distinguishing between black and dark blue and between gray and silver. (Tr. 307-308).

{¶8} After the victim died, Detective Martin went to the victim's residence and spoke to his girlfriend, who testified at trial. She disclosed that their neighbor, who lived three doors down, owned a large green SUV. (Tr. 442, 448, 529). The neighbor's nickname was "Smoke." (Tr. 439). At trial, the victim's girlfriend identified Appellant as the neighbor who was the subject of her statement. The victim

performed house and car repairs for Appellant in the weeks prior to his death. (Tr. 439). The victim's girlfriend showed the detective her caller identification displaying the various calls Appellant made to their house. (Tr. 443). In addition, she reported Appellant came to their house five to six times in one night looking for the victim and seemed upset. (Tr. 439-440). She said this was "strange" and made her nervous. (Tr. 439). The victim also seemed unusually nervous in the weeks leading up to his death. (Tr. 440-441).

{¶9} On November 5, 2012, the eyewitness to the shooting came to the station to view a photo line-up and to add to her statement, the video of which was played to the jury. (Tr. 342, 348-349). The witness reported that she remembered seeing a gray car on the opposite side the street and believed the shooter may have spoken to the person in the gray car before driving away. (Tr. 336-337, 360). She was then administered a photo line-up at the police department by a "blind administrator." Appellant's photograph occupied folder number seven in the first array. (Tr. 535). On her second viewing of the first array, the witness said number three looked like the shooter. She also voiced that number seven looked like the shooter and started crying. (Tr. 373-374, 457). Pursuant to policy, she was not permitted to view the array a third time as she requested. In viewing the second array, she expressed that number one reminded her of number three from the prior array.

{¶10} She did not identify the shooter to the administrator; at trial, she explained she thought she was supposed to voice her suspicions to Detective Martin. (Tr. 370). Upon exiting the room, the eyewitness spoke to Detective Martin and informed him that seeing number seven brought it all back, stating she was 99% sure he was the shooter. (Tr. 350, 357-358, 370, 536). She similarly advised the deputy sheriff who drove her home; this officer was her landlord. (Tr. 321, 540). At trial, she identified Appellant as the shooter (and as number seven in the array). (Tr. 296).

{¶11} The police watched Appellant's residence and eventually spotted a green Chevrolet Avalanche, which Appellant later acknowledged was exclusively driven by him. (Tr. 529, 545). As the state pointed out in closing, the photographs

show the vehicle is an unusual style of truck. (Tr. 673). It is a four-door pick-up truck, but the back of the cab protrudes toward the bed at an angle with a triangular cut-out behind the back passenger windows, making it appear as if a third row is behind the second row of seats. Detective Martin noted the truck had a gray strip of molding down the side and a silver strip in the front. (Tr. 613). When the photographs were shown to the eyewitness, she did not recall the bed on the vehicle but said it was the same style. (Tr. 585, 595). Notably, the victim's girlfriend, who knows Appellant and is his neighbor, also described the vehicle as an SUV.

{¶12} On November 29, 2012, Appellant was secretly indicted for aggravated murder (with prior calculation and design) and a firearm specification. He was arrested the next day. A gun and ammunition, which belonged to Appellant, were confiscated from his residence; this evidence did not match the evidence from the scene. A superseding indictment was filed to add a count for having a weapon while under a disability. Appellant waived his right to a jury trial on the weapons charge, electing to have that charge tried to the bench. The aggravated murder charge and the firearm specification were tried to a jury, which was also instructed on the lesser included offense of murder.

{¶13} The jury found Appellant guilty of aggravated murder with a firearm specification, and the court found him guilty of having a weapon while under a disability. The court sentenced Appellant to life without parole for the aggravated murder, three years for the firearm specification, and three years for the weapons charge to run consecutive. (Aug. 25, 2014 Sent. Hrg.; Sep. 11, 2014 Sent. J.E.).

ASSIGNMENTS OF ERROR ONE & TWO:  PEREMPTORY CHALLENGE

{¶14} Appellant's first two assignments of error, which concern one peremptory challenge utilized by the state, provide:

"The trial court erred when it excused a juror after the State offered a facially discriminatory explanation for the use of its peremptory challenge."

"The trial court's decision to excuse a black juror after a *Batson* challenge is clearly erroneous when it fails to make the necessary *Batson* findings and instead relies upon impermissible factors." (Citations omitted.)

**{¶15}** The state used its third peremptory challenge on prospective juror number 7, Mr. Whitfield. (Tr. 178). An unrecorded sidebar was held after which an in chambers discussion was recorded. (Tr. 178-179). Defense counsel noted this was the second minority juror excused by the state. He stipulated "there are two remaining minority jurors in this case" and noted other minority members of the upcoming panel would likely not be reached. Counsel voiced a *Batson* objection asking the court to determine whether there existed a race neutral reason for the peremptory challenge. (Tr. 179). The assistant prosecutor responded:

> * * * Whitfield, his last name, we have prosecuted many Whitfields.
> He's from the south side as well. So even though he didn't indicate he
> had any family members that were prosecuted by us or who had
> convictions, I'm afraid that this Mr. Whitfield is related not only to
> Reginald Whitfield, who we just had a case with in Judge Durkin's court,
> but many of the other Whitfields who we have prosecuted. They are all
> from the south side. (Tr. 180).

**{¶16}** Defense counsel responded that the state could have asked this of the juror in voir dire and still could do so, opining it would not be offensive. (Tr. 180). At this point, the assistant prosecutor pointed out there were still three or four more minorities in the back of the courtroom. (Tr. 180). Defense counsel reiterated his belief that they would not reach those panel members. A different assistant prosecutor then commented that the defendant and the victim were both African-American, as opposed to a white victim. Defense counsel protested that the issue of whether there is an African-American victim is not the point of the Supreme Court law on the subject. (Tr. 181). The court overruled the objection and allowed the state's peremptory challenge to stand.

**{¶17}** Being an Equal Protection clause argument, the burden is on the defendant to prove the state racially discriminated in the use of a peremptory challenge. *Batson v. Kentucky*, 476 U.S. 79, 93, 106 S.Ct. 1712, 90 L.E.2d 69 (1986). The process entails three steps: (1) the defendant's prima facie case of racial discrimination; (2) the state's obligation to set forth a race-neutral reason; and

(3) the trial court's judgment as to whether the prosecutor purposefully discriminated. *See id.* at 97-98.

{¶18} First, the defendant must object to the peremptory challenge and set forth a prima facie case of racial discrimination by pointing to relevant circumstances that raise an inference the prosecutor used the challenge to exclude the prospective juror on account of his race, which could include: the state's use of a prior challenge against the same race; the defendant and the challenged juror are members of the same racially cognizable group; and/or disparate questions were asked in voir dire. *Id.* at 96-97. *See also Powers v. Ohio*, 499 U.S. 400, 416, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (racial identity between the defendant and the excused juror may make it easier to establish the case, but race is irrelevant to a defendant's standing to assert discrimination against a juror). This preliminary issue of whether the defendant made a prima facie showing becomes moot, however, if the state offers a race-neutral explanation for the peremptory challenge and the trial court rules on the ultimate question of intentional discrimination. *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

{¶19} Under the second step, the state must provide a racially neutral explanation for the challenge. *Id.* A race-neutral explanation for a peremptory challenge is simply "an explanation based on something other than the race of the juror." *Hernandez*, 500 U.S. at 360. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.*

{¶20} Third, if the state provides a race-neutral explanation, the trial court must view all the circumstances and determine whether there was purposeful discrimination, i.e. whether the explanation is merely pretextual. *Batson*, 476 U.S. at 98. Although this step entails evaluating the persuasiveness of the state's explanation, the burden of persuasion regarding racial motivation remains on the defendant. *Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006); *State v. Gowdy*, 88 Ohio St.3d 387, 393, 727 N.E.2d 579 (2000) ("The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."). We do not reverse a trial court's decision on

intentional discrimination unless it was clearly erroneous. *See State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 64; *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 106, 110 (defer to the trial court's credibility decision).

**{¶21}** Appellant contends an evaluation of his prima facie case is moot since the state provided an explanation upon which the court ruled. *See State v. White*, 85 Ohio St.3d 433, 437, 709 N.E.2d 140 (1999) ("Once the proponent explains the challenge and the trial court rules on the ultimate issue of discrimination, whether or not a prima facie case was established becomes moot."), citing *Hernandez*, 500 U.S. at 359. The state agrees and proceeds to address Appellant's next contention.

**{¶22}** Appellant alleges the reason provided by the state is facially invalid rather than racially neutral. He argues the trial court would never reach the third step where the credibility of the prosecutor making the statement is evaluated. Appellant asserts the state voiced race was a consideration when it assumed African-Americans with the last name of Whitfield who live on the same side of town are related. He believes the state's explanation carries a presumption that race, neighborhood, and last name define the prospective juror as fitting in an undesirable category.

**{¶23}** Appellant presents various arguments which appear more related to an argument of intentional discrimination under the third step than an argument that the reason was not race-neutral. For instance, Appellant urges that the state's failure to conduct voir dire on the subject of relatives is evidence suggesting the explanation is a pretext for discrimination. He also argues the state's explanation was based upon an *unsupported* assumption or fear that the juror was related to criminals due to his last name and neighborhood. He urges the state did not explain why being related (by an unknown degree of relationship) to a criminal would be problematic.

**{¶24}** "In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." *Hernandez*, 500 U.S. at 359. The explanation is not unconstitutional solely

because it results in a racially disproportionate impact. *Id.* at 359-360. Discriminatory purpose implies the prosecutor exercised the challenge "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 360 (awareness of consequences does not equate with discriminatory intent).

**{¶25}** The state's explanation for the peremptory challenge must merely be based on something other than the race of the juror. *Id.* at 360. It need not rise to the level of a challenge for cause. *Batson*, 476 U.S. at 97. In this step, the state's explanation need not be "persuasive, or even plausible" as long as the reason is not inherently discriminatory. *Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006). In fact, the state's reason can be silly or superstitious as long as it is not race-related; the persuasiveness of the explanation does not arise until the third step. *Purkett v. Elem*, 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (long unkempt hair and facial hair is race neutral). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360.

**{¶26}** Notably, the court asked the panel whether any of their family members have ever been charged or arrested. (Tr. 52). This question prompted no disclosure by juror number 7. A concern that a prospective juror is related to various individuals prosecuted by that same prosecutor's office, including one recent conviction cited by name to the court, is not racially discriminatory. In addition, there is the concern, expressed by the state, that a juror did not mention prosecuted family members when asked.

**{¶27}** "Removing a juror based on the past criminal history of him or her, or his or her family member, is a valid, race-neutral reason for raising a peremptory challenge." *State v. Lacey*, 7th Dist. No. 10MA122, 2012-Ohio-1685, ¶ 127, quoting *State v. Santiago*, 10th Dist. No. 02AP-1094, 2003-Ohio-2877, ¶ 10. *See also State v. Coleman*, 85 Ohio St.3d 129, 142, 707 N.E.2d 476 (1999) (prior involvement with drug trafficking by family member of prospective juror is a race-neutral explanation under step two that trial court could find credible under step three); *State v. May,* 8th

Dist. No. 102482, 2015-Ohio-4275, ¶ 51 ("the potential bias that may result from a prospective juror's or his or her family's experiences with the criminal justice system may be a legitimate, racially neutral reason for exercising a peremptory strike against the prospective juror"); *State v. Reed*, 6th Dist. No. L-97-1133 (June 12, 1998) (excused jurors had relatives who had been convicted of crimes).

**{¶28}** The skin color of the Whitfield named by the state (as an example of a recent prosecution by this prosecutor's office) was not mentioned; nor was the skin color of any of the other prosecuted Whitfields mentioned. Appellant cites us to an offender search of the website of the Ohio Department of Rehabilitation and Corrections to establish that the most recently prosecuted Whitfield named by the state was African-American. *See* Appellant's Brief at 19, fn.4. This is evidence outside the trial record.

**{¶29}** Regardless, skin color does not eliminate the possibility of familial relationship with another by affinity or consanguinity. There is no indication in the explanation that the state would not have exercised the challenge if juror number 7 was a Whitfield from the south side of town who appeared to be white. An explanation is not unconstitutional on its face solely because it results in a racially disproportionate impact. *Hernandez*, 500 U.S. at 359-360. Whether the state's concern was genuine versus pretextual involves the third step, and we will consider Appellant's arguments relating to this subject under the discussion of that step, infra.

**{¶30}** In assignment of error number one, Appellant also condemns the prosecution's observation that three or four more African-Americans remained for potential seating on the jury and that the case involved a victim and a defendant of the same race. These are not race-neutral reasons for excluding juror number 7. *See, e.g., State v. Gowdy*, 88 Ohio St.3d 387, 393, 727 N.E.2d 579 (2000) (as the Fourteenth Amendment protects the juror from discrimination, the fact that another juror of the same race remained on the jury does not preclude a holding that the state unlawfully removed a juror).

**{¶31}** However, the mere making of such observations *after* providing race-neutral reasons does not result in a finding that the state failed to set forth a race-

neutral reason under step two of the analysis. *See Gowdy*, 88 Ohio St.3d at 393 (the Court continued to address the other explanations provided by the state). Notably, the state's observations were made *after* defense counsel predicted the remaining voir dire would not reach the other African-Americans on the venire, which would leave only two minorities on the jury. Likewise, defense counsel pointed out this was the second excused minority juror. (Tr. 179). Moreover, the effect of the state's challenges is a factor that can be considered in determining pretext under the third step in the analysis. *See Miller-El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). *See also Batson*, 476 U.S. at 97 (the defendant can also use the number of challenges to minorities to bolster his prima facie case).

**{¶32}** Related to this argument, Appellant's second assignment of error claims the court considered impermissible factors. *After* allowing the state to excuse juror number 7, the judge stated: "And the court does acknowledge that there are blacks sitting in - - waiting in the back that are available. And Mr. Whitfield was not the only minority on this jury." (Tr. 182). Again, defense counsel first brought up the fact that only two minorities would remain on the jury without juror number 7 and predicted he would not reach the other minorities in the back of the courtroom during voir dire. (Tr. 179). Additionally, because the effect of the challenge is a circumstance a court can consider in evaluating the issue of pretext, the mere acknowledgement of the composition of the present jury and venire would not constitute an error. *See generally Miller-El v. Dretke*, 545 U.S. 231; *Batson*, 476 U.S. at 97.

**{¶33}** Appellant's second assignment of error also claims the trial court erred in failing to make the "necessary *Batson* findings." When presented with such an argument, the Ohio Supreme Court has stated: "Certainly, more thorough findings by the trial court in denying the defense *Batson* objections would have been helpful. However, the trial court is not compelled to make detailed factual findings to comply with *Batson*." *State v. Frazier*, 115 Ohio St.3d 139, 152, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 98.

**{¶34}** After providing the parties a reasonable opportunity to make their respective records, the trial court's ruling on the credibility of a proffered race-neutral explanation can merely be expressed in the form of a clear rejection or acceptance of a *Batson* objection. *Id. See also Gowdy*, 88 Ohio St.3d at 393, 395 (where the defendant claimed the trial court did not proceed to step three of the inquiry and instead stopped after determining the reasons advanced by the prosecutor were race-neutral). Here, the trial court clearly rejected the *Batson* objection, which was sufficient to express its ruling.

**{¶35}** We proceed to address the final question concerning whether the trial court could rule that the defendant did not meet his burden of showing the prosecution's concern was mere pretext. Appellant points out the failure to conduct voir dire on the subject is evidence suggesting the explanation is a sham or pretext for discrimination. *Citing Miller-El v. Dretke*, 545 U.S. at 246 (quoting an Alabama case via parenthetical). The Court made this statement in assessing the implausibility of the state's explanation involving the criminal conviction of a prospective juror's brother; the Court emphasized that the explanation was only proffered after the state's initial reason was shown to be an improper characterization of the juror's responses to questions on the death penalty. *Id. See also id.* at fn. 8 (other jurors had relatives convicted of crimes who were not struck).

**{¶36}** The *Miller-El v. Dretke* case was a capital case tried prior to *Batson* and remanded by a state appellate court to the trial court for consideration of *Batson*, which hearing elicited additional facts concerning the state's discriminatory practices in voir dire, including: out of 20 black members of a 108-person venire panel only 1 served; 10 blacks were peremptorily struck by the state, which excluded 91% of the eligible black venire members; side-by-side comparisons of black panelists and white panelists allowed to serve suggested bias; disparate questioning of the races occurred; the state used a manual with reasoning for excluding minorities; and, the state employed a Texas "jury shuffling" practice when blacks moved to the forefront of the venire. *See id.* at 240-241, 253 (reviewing statistics and other "clues" as to the prosecution's intentions, in addition to the peremptory challenges themselves).

**{¶37}** As can be seen, the *Miller-El v. Dretke* case contained many circumstances that distinguish it from the case at bar. For instance, we have the statement that this juror was the second minority juror excused, but we do not have extreme statistics. Nor do we have the situation where "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve * * *." *See Miller-El*, 545 U.S. at 241. There was no indication that any non-black juror may have had a family member who had been recently convicted by this prosecutor's office (or at all).

**{¶38}** Appellant counters that there is no indication juror number 7 had such a family member either. The fact that the state did not specifically inquire of juror number 7 as to whether he was related to various Whitfields is a factor to consider in evaluating whether there was purposeful discrimination. However, it is not dispositive. The statement in *Miller-El*, 545 U.S. at 246, that a failure to inquire is suggestive of pretext, was not a holding that a failure to inquire per se establishes pretext. The jury questionnaire and the court asked about family members who were charged or arrested, and this juror did not make a disclosure. Still, the prosecution was concerned. The court must "assess the plausibility of" the prosecutor's reason for striking the juror "in light of all evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. at 252.

**{¶39}** The trial court was to ascertain whether the prosecutor's concern was genuine. The prosecutor's office recently prosecuted a Reginald Whitfield. Besides providing a specific defendant's name, the state pointed to the trial judge who presided over that defendant's case. This prosecutor's office also prosecuted "many of the other Whitfields," all of whom live on the south side of town where this juror lived, which caused her to be "afraid" the juror was related to the prosecuted Whitfields. (Tr. 180). As aforementioned, having relatives that were convicted of crimes is a valid concern of the prosecution about a prospective juror. *See, e.g., Coleman*, 85 Ohio St.3d at 142 (1999). The concern is greater where the relatives were recently prosecuted by this prosecutor's office. A trial court may believe a

prosecutor's expression of concern when evaluating whether the state engaged in purposeful discrimination.

**{¶40}** Appellant replies that the concern is unfounded *as to this juror* because the existence of a familial relationship is based upon an assumption unsupported by the record. The state counters that the record suggests a strong likelihood the juror was related to individuals prosecuted by that prosecutor's office.

**{¶41}** In *Rice*, the state exercised a peremptory challenge against an African-American female based on a fear that a young single citizen with no ties to the community might be too tolerant of the crime at issue, even though the juror's answers in voir dire did not support such a belief. The United States Supreme Court held that pretext is not established merely because the prosecutor claimed to hold such concerns despite the juror's voir dire averments. *Rice*, 546 U.S. at 341. The Court found it was not unreasonable to believe the prosecutor remained worried about the juror even if the prosecutor could be seen as overly cautious. *Id.* (reversing the Ninth Circuit's decision to reverse state court decisions on the matter).

**{¶42}** The trial court's decision is partially based upon the prosecutor's demeanor in explaining her position; whether the prosecutor's explanation is genuine is a credibility determination subject to great deference. *Davis v. Ayala*, __ U.S. __, 135 S.Ct. 2187, 2199, 2201, 192 L.Ed.2d 323 (2015) (adding: "Appellate judges cannot on the basis of a cold record easily second-guess a trial judge's decision about likely motivation."). Moreover, our standard of review is whether the trial court was "clearly erroneous" in accepting the state's explanation as genuine as opposed to a pretext for purposeful discrimination. *Id.* at 2199; *Frazier*, 115 Ohio St.3d 139 at ¶ 64. Although other judges could disagree with this trial judge's decision that the prosecutor's assessment was plausible, "a trial judge *may* choose to disbelieve a silly or superstitious reason"; "implausible or fantastic justifications *may* (and probably will) be found to be pretexts for purposeful discrimination." (Emphasis added.) *Purkett*, 514 U.S. at 768 (reversing the appellate court's decision that long unkempt hair and facial hair is not a race-neutral reason and remanding for the appellate court to

review the trial court's third stage decision on whether the prosecutor's explanation was genuine).

**{¶43}** This court finds the trial court was not clearly erroneous by believing the prosecution did not purposefully discriminate when it asked to excuse juror number 7. Whitfield is not a noticeably common surname like Jones or Smith. The prosecutor's office was involved in investigating and prosecuting many Whitfields from the same area of town as the juror. The prosecutor's lingering concerns, notwithstanding the juror's failure to report a relative's arrest, does not so lack plausibility that the trial court's decision should be rendered clearly erroneous. For all of these reasons, the first and second assignments of error are overruled.

<u>ASSIGNMENT OF ERROR NUMBER THREE</u>

**{¶44}** Appellant's third assignment of error provides:

"The trial court erred in denying a mistrial when the jury repeatedly heard inadmissible testimony regarding threats to witnesses; and, as a result, deprived Mr. Mitchell of a fair trial." (Citations omitted.)

**{¶45}** Prior to trial, the defense filed a motion in limine concerning evidence the eyewitness had been threatened. The state informed the court it would only present testimony that the witness was and remains fearful, adding the state had no intent to inform the jury of specific instances where the witness was approached or threatened. Defense counsel replied they would deal with it when it arose since it depended upon how the question was asked. (Tr. 23). The state pointed out the contact with the witness could not be attributed to the defendant (or they would have charged him with intimidation). The state then agreed that asking the eyewitness about specific instances of threats would be inappropriate. (Tr. 24).

**{¶46}** When the eyewitness testified, she was asked if she had some worries and was scared when she spoke to the detective. She answered affirmatively and said she was still scared. (Tr. 295). Detective Martin testified about the photographic line-up. He was asked why he decided to have the witness view a second photo array. The detective responded, "There was a second suspect that through my investigation that was - - I don't know if - - I believe he's a cousin or an associate, and

he was involved in another investigation with Janero Mitchell by the name of - -." An objection was sustained. Defense counsel asked the court to strike the response, and the court instructed, "Jury will be asked to not consider the statement that the officer just made." (Tr. 537).

{¶47} Thereafter, the detective testified the eyewitness was still fearful when she viewed the photographs on November 5. He explained he waited until November 30 to arrest Appellant because he was concerned about this witness, saying that everyone knew where she lived. He then added, "She already had somebody come to the house threatening her." (Tr. 540). Defense counsel objected, and the court sustained the objection. (Tr. 540-541). A sidebar was held, after which the court amended the ruling to "sustained as to that response but stick around after." The detective then stated he wanted to allay some of the witness's fears by waiting until she moved out of the area. (Tr. 541).

{¶48} After the state's direct examination, the court released the jury for the day. Defense counsel moved for a mistrial. He pointed to his sustained objections on the detective's testimony about another investigation and threats. He said the answers would lead the jury to believe the threats came from the defendant. (Tr. 549-551). The court overruled the motion for a mistrial.

{¶49} Thereafter, defense counsel mentioned, on cross-examination, the report of a gray car at the scene in conjunction with the second photo line-up. He also asked the detective if the victim's girlfriend brought up the name "Willie D." Defense counsel inquired if the photos in the line-up were for the purpose of picking out the shooter, and the detective responded: "One was for the shooter and actually the other one was for the individual that had come to the house and had threatened her." (Tr. 564). Defense counsel then asked: "You have no threats that relate to Janero Mitchell?" The detective agreed. (Tr. 565).

{¶50} Appellant argues the trial court abused its discretion in overruling the motion for a mistrial. He states the jury heard inadmissible testimony about threats, an investigation, and a suspect who was his associate. He asserts this undermined confidence in the outcome as a fair trial was no longer possible. The state responds

there was no prejudice as defense counsel made it clear during cross-examination that Appellant was not connected to the threats. Appellant urges that defense counsel's elicitation on cross-examination did not undo the damage. As evidence of the prejudicial impact on the jury, Appellant points to two jury questions.

{¶51} First, shortly after the jury began deliberations, the parties decided the jury should break for the evening. The court made pertinent advisements about not forming an opinion or talking in the absence of the entire jury. The court warned the jury not to let anyone talk to them or approach them about the case. The court said that if anything unusual happens, they should notify the deputies. (Tr. 741-742). A juror asked, "Now, you were saying if something happens at home or something * * * call the sheriff, don't call 911?" (Tr. 742). The court responded, "Either one. I don't expect anything is going to happen." The juror replied, "I hope not. That's crossed my mind." (Tr. 743).

{¶52} At that point, defense counsel again moved for a mistrial (or in the alternative, voir dire of the juror who asked the question). He voiced a connection between the testimony on threats and the juror's expression that a need to call the police "crossed my mind." (Tr. 746, 748-749). The state pointed out the juror did not initiate the conversation but was merely clarifying the court's instructions. (Tr. 746-747). It was noted that it was not unusual for jurors to be concerned when involved in a violent case such as this. (Tr. 747, 749). The court overruled the defense motion. The court found the juror's question was made in response to the court's instructions. The court suggested the question was not related to testimony, but may have been related to the fact that someone yelled at a witness who was leaving the courthouse, "you better know what you're talking about." (Tr. 750).

{¶53} The next question was raised after the jury had signed its verdict. (Tr. 751-752). They asked if their information would be made public. (Tr. 751). Defense counsel renewed the motion for a mistrial, urging the question showed fear by jurors due to testimony of threats. (Tr. 752-753). The motion was overruled.

{¶54} The granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of

discretion. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). To show an abuse of discretion in failing to grant a mistrial, the defendant must demonstrate material prejudice. S*ee State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, __ N.E.3d __, ¶ 198. A mistrial is not warranted in a criminal case merely because some error or irregularity occurred. *Treesh*, 90 Ohio St.3d at 480. A mistrial is necessary only when a fair trial is no longer possible. *Id.* (a police officer's comment as to a suspect's silence or his request for an attorney, although improper, did not require a mistrial after curative instruction given). *See also State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995) (a police officer's fleeting reference to the defendant's prior arrests did not necessitate mistrial after curative instruction given).

{¶55} Here, there was no objection to the eyewitness testifying that she was in fear for her safety. (Tr. 295). A witness's expressed fear for her safety due to involvement in the case does not necessarily suggest the defendant committed another bad act or require a mistrial. *See State v. Fredenburg*, 10th Dist. No. 97APA10-1340 (Sept. 17, 1998), citing *State v. Smith*, 10th Dist. No. 94APA01-119 (Sept. 20, 1994).

{¶56} Appellant's concern is disclosure of threats and the investigation of an associate.[1] Appellant points out the state is generally prohibited from introducing evidence "tending to show that a defendant committed another crime" wholly independent of the offense being tried. *State v. Frazier,* 73 Ohio St.3d 323, 338, 652 N.E.2d 1000 (1995), citing *State v. Hector*, 19 Ohio St.2d 167, 249 N.E.2d 912 (1969), paragraphs one of syllabus. There are exceptions, such as where the evidence is offered as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Evid.R. 404(B). Appellant notes the state must provide reasonable notice in advance of trial of the general

---

[1] In the reply brief, Appellant adds that the arresting officers were permitted to testify a gun was confiscated from Appellant's home, which was not related to this offense. A reply is not the place for new arguments. In any event, prior to trial, the defense withdrew the motion in limine on the gun and ammunition found during Appellant's arrest, thus consenting to its admission into evidence. (Tr. 22). This was presumably because testimony that Appellant's gun and ammunition did not match the evidence recovered from the scene of the crime could be viewed as favorable to the defense.

nature of any such evidence it intends to introduce at trial, unless the court excuses pretrial notice on good cause shown. *Id.*

**{¶57}** The state's brief suggests threats to a witness can be relevant to establish why a witness is hesitant to identify a suspect. *Citing, e.g., State v. Grimes*, 1st Dist. No. C-030922, 2005-Ohio-203, ¶ 56 (references to witness intimidation were not improper because they were offered to demonstrate why the witnesses' stories had changed, and why some of the witnesses had not immediately come forward to the police with information about the shooting). Appellant notes this was not mentioned below and does not address the prosecution's acknowledgement that testimony on a specific threat would be inappropriate in this case as there was no evidence connecting Appellant to the threat. *See id.* at ¶ 55 (specific evidence of witness intimidation is admissible to show consciousness of guilt, which must ordinarily be shown by a specific act of the defendant).

**{¶58}** As aforementioned, the state agreed just prior to trial it would not introduce evidence of specific threats made to the eyewitness, stating they had no evidence the defendant was involved. (Tr. 23). Additionally, the court sustained the objection to the detective's revelations.

**{¶59}** Appellant relies on a Second District case where a police officer testified the defendant was involved in a previous robbery and fled from officers when being arrested (which counsel failed to object to, even though it violated an in limine ruling) and a witness testified the defendant's family members sent death notes to her house. *State v. Brown*, 2d Dist. No. 24420, 2012-Ohio-416. The Second District held that the cumulative effect of the testimony necessitated a mistrial, pointing out that the defendant was not connected to the crime by overwhelming evidence. *Id.* at ¶ 44-45.

**{¶60}** Appellant believes the case is on point. However, it is not binding precedent, and each criminal trial has factual distinctions. As the state notes, the *Brown* case involved more than mere implications. In *Brown*, there were disclosures that the defendant was involved in a prior robbery, he fled from police when they

attempted to arrest him on an aggravated robbery warrant, and his family members sent "death notes" to the witness.

**{¶61}** Relying on *Brown*, Appellant suggests we must find the detective's disclosures harmless beyond a reasonable doubt in order to affirm. Yet, where the court sustains an objection and a mistrial is sought, the test is as set forth earlier: "the ends of justice so require and a fair trial is no longer possible." *State v. Trimble*, 122 Ohio St.3d 297, 321, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 173 (evidence of prior conviction inadmissible, trial court sustained objection, and instructed jury to disregard answer, mistrial not required as fair trial was still possible), citing *Garner*, 74 Ohio St.3d at 59 (police officer's reference to the defendant's prior arrests did not necessitate mistrial after curative instruction given). We proceed to analyze the relevant facts of this case under the law pertinent to mistrial requests where an objection was sustained.

**{¶62}** We begin with the detective's statement that he placed a suspect in the second photo line-up who was an associate involved in another investigation with the defendant. Before the detective could finish his answer about his other investigation, defense counsel objected. The trial court sustained the objection, ordered the response struck, and instructed the jury to disregard the answer. (Tr. 537). Additionally, after all testimony was presented, the court's general instructions advised that if a statement was stricken by the court, the jury is to disregard the statement and act as if they never heard it. The court also ordered the jury not to speculate as to why the court sustained any objection. (Tr. 719). "We presume that the jury followed the court's instructions, including instructions to disregard testimony." *Treesh*, 90 Ohio St.3d at 480, citing *State v. Loza*, 71 Ohio St.3d 61, 75, 641 N.E.2d 1082 (1994).

**{¶63}** As set forth supra, the detective's next objected-to statement was in response to a question as to why an arrest did not occur immediately after the identification. The question was important as it was meant to dispel any concern the detective did not believe the eyewitness's identification of number seven to him and to the deputy sheriff. The detective explained he was concerned about the witness

and he was waiting for her to move. He added that someone came to the eyewitness's house to threaten her, at which point the defense objected. The court sustained the objection. After a sidebar, the court repeated that the objection was "sustained as to that response." (Tr. 541). The defense did not request a curative instruction to strike and disregard the statement, *which is said to be a prerequisite for seeking a mistrial. See Adams*, 2015-Ohio-3954 ¶ 204 (motion for mistrial has no merit when court sustains objection and defendant never requests cautionary instruction), citing *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, at ¶ 103; *State v. Davie*, 80 Ohio St.3d 311, 322, 686 N.E.2d 245 (1997) (where objection is sustained, the defense must seek curative instruction to raise issue thereafter).

**{¶64}** From these two sustained objections, it does not appear a fair trial was no longer possible or "the ends of justice" mandated a mistrial. *Brinkley*, 105 Ohio St.3d 231 at ¶ 105, quoting *Garner*, 74 Ohio St.3d at 59. Assuming inadmissible testimony was set forth just prior to the objection, the mere occurrence of an error or irregularity does not warrant a mistrial. *Treesh*, 90 Ohio St.3d at 480. There is no indication the trial court abused its broad discretion in denying the motion as material prejudice was not apparent. See *Adams*, 2015-Ohio-3954, at ¶ 198.

**{¶65}** Thereafter, on cross-examination, the detective was asked to clarify that the second photo array was composed around the person believed to have made threats and that the threats *did not involve Appellant.* (Tr. 564-565). Any implied link to Appellant was diminished by this cross examination, further minimizing any prejudice.

**{¶66}** Appellant urges material prejudice became apparent at the time of his renewed motion for a mistrial after the two jury questions: (1) a juror orally said it "crossed [his] mind" he should know who to call if he is approached about the case; and (2) a written jury question asked whether the verdict forms containing their names would be released as a public record. These are not unusual queries for a violent murder case and need not be attributed to the two sustained objections.

{¶67} There is no indication the first question was incited by the detective's suggestion he investigated a threat to the witness by someone else nearly two years prior. The court believed its colloquy with the juror related to the fact that someone had yelled at a witness in the courthouse during trial. Moreover, the first question was an immediate response to a jury instruction provided by the court about the jurors' obligations during deliberations. (Tr. 741-743). As the state pointed out, jurors in cases of this nature have similar concerns. (Tr. 749). The court was not required to grant the request for a mistrial as the jury questions did not provide evidence of material prejudice. Additionally, the defense had elicited testimony on the threats to the witness by this time.

{¶68} This court concludes the trial court did not abuse its broad discretion in denying the mistrial motions. For all of the foregoing reasons, this assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER FOUR: TESTIMONY ON TIP

{¶69} Appellant's fourth assignment of error provides:

"Mr. Mitchell was denied his right to confront the evidence against him at trial, in violation of his Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution."

{¶70} As set forth in the statement of facts, the victim's live-in girlfriend testified: the defendant was her neighbor, who lived three doors down; his nickname was "Smoke;" he drove a green vehicle she called an SUV; the victim did house and car repairs for Appellant in the weeks leading up to the shooting; Appellant appeared upset as he repeatedly came to their house looking for the victim, which was unusual; and the victim seemed nervous as he avoided Appellant. (Tr. 438-442, 444, 448).

{¶71} Later, the state questioned the lead detective on the stages of his investigation. When asked what happened the day after the shooting, the detective began explaining that two of the victim's relatives told him "that they had heard * * *." Defense counsel objected, and the court sustained the objection. (Tr. 523). The detective then testified that he followed up on a tip received from the victim's

relatives.  (Tr. 524).  After the state asked what he was looking for based on the tip, the following took place:

A  Well, the only tip I had was that the individual  - -

[Defense counsel]:  Objection.

COURT: You can finish it from who - - from an individual, but the extent of the conversation is sustained.

Q Not saying what they said, but based on those tips, who were you looking for?

[Defense counsel]:  Objection.  That's saying it the same way, Your Honor.

COURT:  No, he can answer that.

Q  Go ahead.

A   For an individual who went by the name of Smoke who drove a green SUV and lived in the neighborhood.  (Tr. 524).

The detective then explained how he investigated two other individuals with the nickname of Smoke; he discovered one was incarcerated on the day of the shooting, and he could not connect the other to a green vehicle.  (Tr. 525-526).

{¶72} Appellant urges the trial court erred in permitting the detective to testify that, based upon a tip, he began looking for a person with the nickname Smoke who drove a green SUV and lived in the neighborhood.  Appellant believes the state magnified the error in its closing argument.

{¶73} For instance, the state's closing noted the eyewitness reported to the lead detective and a sheriff's deputy that number seven was the shooter and observed:  "It just so happens that number seven is Janero Mitchell, number seven is the one who drives a green SUV truck, and number seven is known as Smoke. Same as what [the victim's girlfriend] described."  (Tr. 673-674).  The state later asked the jury to consider the eyewitness's testimony in light of the all the other evidence, noting it was not just her identification:  "It's her identifying someone matches the name Smoke, who drives a green truck and who is having a dispute with

the victim. And he admitted to Detective Martin himself, he knew the victim and he's the only one who drives that green truck." (Tr. 676-677).

**{¶74}** Appellant further points to statements in the final closing such as: "[The victim's girlfriend] only gave the starting point. You know what? This Janero Mitchell, this Smoke, he's been calling, he's been calling, they have been stopping, him and Willie D, his friend, they are stopping by, looking for Mark and Mark keeps ignoring them. And they stop calling after he's shot." (Tr. 710-711). Finally, Appellant believes the state used the tip testimony in the following statement: "She doesn't know that number seven goes by Smoke. She didn't know that number seven and Mark Haskins knew each other. She didn't know that number seven is going to be the one with the green truck. It's not a coincidence. She doesn't know that he lived three houses away from each other." (Tr. 713).

**{¶75}** Appellant believes these were all references to the testimony about the content of the tip. However, the state's point in closing was that this is not merely a case of an eyewitness identification of a stranger; rather, the case has additional corroborating factors. For example, the eyewitness picked out a person who was the victim's neighbor; the eyewitness described a green SUV as the vehicle the shooter drove away from the scene; the victim's girlfriend reported their neighbor "Smoke" had been looking for the victim in an upset manner and he drove a green SUV; and a green Chevy Avalanche was admitted to be the vehicle exclusively driven by Appellant.

**{¶76}** Therefore, even if the admission of the contents of the tip was erroneous, these closing arguments cannot be characterized as improper. *State v. Ricks*, 136 Ohio St.3d 356, 361, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 43 (where prosecutor referred to statement of non-testifying declarant). These closing arguments could have been made even in the absence of the testimony on the tip. We turn to evaluate the admissibility of the detective's testimony as to the content of the tip.

**{¶77}** The trial court typically has broad discretion in admitting or excluding evidence, and the exercise of that discretion will not be disturbed absent material

prejudice. *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343, 350 (1987). However, Appellant complains the "double hearsay" involved in the detective's statement was testimonial and prohibited by the Confrontation Clause. It has been stated that a de novo standard of review is applied to a claim that a criminal defendant's rights have been violated under the Confrontation Clause. *State v. Barnette*, 7th Dist. No. 11MA196, 2014-Ohio-5673, ¶ 26.

**{¶78}** The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right *.*.*. to be confronted with the witnesses against him." The clause prohibits the admission of testimonial statements of a non-testifying witness unless he was unavailable to testify and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (victim's recorded statement to police was testimonial). The testimonial character of a statement separates it from other hearsay which is not subject to the Confrontation Clause. *Davis v. Washington*, 547 U.S. 813, 821-822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (911 call during domestic dispute was not testimonial due to on-going emergency; victim's statement after being separated from husband and questioned by police was testimonial due to the primary purpose of proving past events relevant to later criminal prosecution).

**{¶79}** "But there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant." *Michigan v. Bryant*, 562 U.S. 344, 358-359, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). The primary purpose of an interrogation is ascertained through an objective analysis of the circumstances of an encounter and the statements and actions of the interrogators and those making a declaration. *Id.* at 360. The severity of the victim's injuries, the informality of the encounter with the declarant, the use of a gun, the absence of an identification of the suspect, the danger to the public or the victim, and on-going emergency are all relevant

considerations in determining the primary purpose. *Id.* at 364-366 (police questioning of victim of shooting who was waiting for emergency medical services).

**{¶80}** Here, we have a tip the day after a shooting provided to the detective by relatives of the victim, which prompted him to investigate a person with a certain nickname from the neighborhood who drives a green SUV. Appellant recognized that even if the statement was testimonial, "there is no dispute the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' " *Ricks*, 136 Ohio St.3d 356 at ¶ 18, citing *Crawford*, 541 U.S. at 59, fn. 9.

**{¶81}** In one case, a police officer testified he received information about a "sports bookmaking" operation taking place in Roseville, Ohio. The Supreme Court held: "extrajudicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed." *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980). The Court found the testimony at issue was not offered to prove the truth of the matter asserted but was only presented "to explain the subsequent investigative activities of the witnesses." *Id.* Notably, in providing general background to explain what led the police to begin an investigation into a possible illegal gambling operation in Roseville, the testimony did not tie the defendants to the gambling operation. *See Ricks*, 136 Ohio St.3d 356 at ¶ 20 (discussing the *Thomas* case)

**{¶82}** In *Ricks*, the Supreme Court agreed with the Tenth District's statement that there are limits to the general rule because of the great potential for abuse and potential confusion to the trier of fact. *Ricks*, 136 Ohio St.3d 356 at ¶ 24, citing *State v. Blevins*, 36 Ohio App.3d 147, 149, 521 N.E.2d 1105 (10th Dist.1987). It was noted that a prosecutor may attempt to use a police officer's testimony as to his investigative conduct as a pretext to introduce highly prejudicial out-of-court statements. *Ricks*, 136 Ohio St.3d 356 at ¶ 24, citing *State v. Humphrey*, 10th Dist. No. 07AP–837, 2008-Ohio-6302. The *Ricks* Court concluded:

> In sum, in order for testimony offered to explain police conduct to be
> admissible as nonhearsay, the conduct to be explained should be

relevant, equivocal, and contemporaneous with the statements; the probative value of statements must not be substantially outweighed by the danger of unfair prejudice; and the statements cannot connect the accused with the crime charged.

*Ricks*, 136 Ohio St.3d 356 at ¶ 28.

**{¶83}** The officer in *Ricks* testified that: as he drove past a house with the declarant-accomplice, the declarant identified the person standing outside as "Peanut", this was the name the officer heard was one of the shooters from another officer (who presumably heard it from the declarant); the declarant-accomplice appeared scared as they drove by; the officer called the house and ascertained the defendant used the name Peanut; and after the officer obtained a photograph of the defendant, the declarant identified the person in the photograph as Peanut. The Court noted that although some of the officer's testimony explained how he obtained a photo of the defendant, other parts of it went much further than explaining the investigation. *Id.* at ¶ 28-30.

**{¶84}** The Court said the statements were unfairly prejudicial, finding the non-hearsay reason for introducing the statements (investigatory background) was pretextual. *Id.* at ¶ 34, 45 (both instances in the officer's testimony when he related that the accomplice said, 'That's Peanut,' constituted hearsay because they were offered to prove the truth of the matter asserted rather than to explain police conduct). The Court found the out-of-court statements "exceptionally damaging" because the declarant was the other suspect in the murder and most of the state's evidence dealt with that other suspect's connection to the crime; in fact, the state's case "revolved" around the declarant. *Id.* at ¶ 34, 36-37. "[A]n alleged accomplice's out-of-court statement incriminating a defendant is 'particularly deserving of cross-examination.'" *Id.* at ¶ 36, citing *State v. Issa*, 93 Ohio St.3d 49, 60, 752 N.E.2d 904 (2001).

**{¶85}** The Court concluded the constitutional Confrontation Clause violation was not harmless beyond a reasonable doubt as there was a reasonable possibility the officer's testimony that the accomplice pointed out the defendant as "Peanut"

contributed to the defendant's conviction. *Ricks*, 136 Ohio St.3d 356 at ¶ 47 (the fact that much of the proof in the case was against the accomplice makes it reasonably possible that the testimony regarding the statements he made in identifying the defendant would have carried weight with the jury). The Court stated that whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence but whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. *Ricks*, 136 Ohio St.3d 356 at ¶ 46, citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (for application of harmless beyond a reasonable doubt test to constitutional error).

**{¶86}** In speaking of harmless error, Crim.R. 52(A) provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." *See also* Evid.R. 103(A) (error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and a timely objection was made). To ascertain whether substantial rights were affected, a court must evaluate prejudice to the defendant. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 23, 27. Courts are to focus on the impact the offending evidence had on the verdict and the strength of the remaining evidence. *Id.* at ¶ 25.

**{¶87}** To ascertain "whether a new trial is required or the error is harmless beyond a reasonable doubt, the court must excise the improper evidence and evaluate the remaining evidence." *Id.* at ¶ 29 (adding the error is harmless if there is overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction). In sum, a prejudicial error that improperly affected the verdict is to be excised, and the remaining evidence is to be weighed to see if there is evidence beyond a reasonable doubt of the defendant's guilt. *Id.* at ¶ 33. *See also State v. Harris*, 142 Ohio St.3d 211, 220, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37 (a case involving a constitutional error, which noted that *Morris* dispensed with any distinction between non-constitutional and constitutional errors when conducting a harmless error review).

{¶88} The law recognizes errors are made in a typical trial and a defendant is not entitled to the perfect trial. *United States v. Hastings*, 461 U.S. 499, 508-509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) ("there can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial."). The *Ricks* Court was most concerned with the declarant being an accomplice, the two non-testimonial identifications of the defendant as Peanut, the state's case revolved around the declarant-accomplice, and other distinguishing facts. The Court's focus was not on the bare fact someone told the officer to investigate Peanut.

{¶89} In our case, the tip led the detective to investigate individuals with the nickname Smoke who drove a green SUV (and lived in the neighborhood). The detective's conduct was relevant, equivocal and contemporaneous with the statements. In urging prejudice, Appellant suggests the tip directly connected him with the shooting by using his nickname. Yet, the tip did not identify Appellant as Smoke. Rather, the *testimony* of an eyewitness identified Appellant as the shooter, and the *testimony* of the victim's girlfriend identified Appellant as Smoke.

{¶90} Additionally, the jury had already heard testimony on these subjects. The investigation of Smoke due to a tip was cumulative of the concerns expressed by the victim's live-in girlfriend to the detective and to the jury as she testified. She disclosed the same information plus additional facts: the victim did home and car repairs for their neighbor, who lived three doors down; the neighbor's nickname was Smoke; he drives a green SUV; he seemed upset with the victim in the time leading up to his death; he came looking for the victim multiple times in one night; the victim seemed to be avoiding Smoke; the neighbor's behavior was strange and made her nervous; and the victim seemed unusually nervous during this time. Finally, as aforementioned, she identified the defendant in court as the subject of her testimony.

{¶91} Furthermore, the eyewitness to the shooting identified Appellant as the person she saw standing near her house firing eight or nine shots at the victim. She reported the shooter looked at her and then entered a green SUV or truck. She identified Appellant's green Chevy Avalanche as being the type of vehicle she saw (although she did not recall the bed on the back). Another witness saw an individual

leave the area by the victim after the gunshots, and she testified that he drove away in a large green truck. Plus, the victim himself made a dying declaration to the responding officer that the shooter's vehicle was a green truck. At the time of his arrest, Appellant admitted he was the sole driver of the green Chevy Avalanche parked in his driveway.

{¶92} Under the circumstances of this case, this court concludes any error in the admission of evidence contained in the tip was harmless beyond a reasonable doubt. Due to the other evidence, the prejudicial impact of the evidence was not high. If we excise the tip and evaluate the remaining evidence, the state proved beyond a reasonable doubt Appellant was the shooter. This includes the evidence mentioned immediately supra and the evidence in our statement of the case, including the victim's 911 call prior to the shooting, which reveals his assailant was accusing him of stealing and asking him to enter a vehicle. This assignment of error is overruled.

ASSIGNMENT OF ERROR FIVE: INEFFECTIVE ASSISTANCE OF COUNSEL

{¶93} Appellant's final assignment of error contends:

"Mr. Mitchell was denied the effective assistance of counsel when defense counsel (1) asked about the 'suspect' in the second line-up when the second line-up pertained to the investigation of threats made against the sole eyewitness, (2) failed to move for a mistrial when Detective Martin offered hearsay from a non-testifying witness to link Mr. Mitchell to the crime, and (3) failed to object [to] the State's use of testimonial 'double hearsay' evidence for the truth of the matter asserted during closing arguments." (Citations omitted).

{¶94} We review a claim of ineffective assistance of counsel under a two-part test, which requires the defendant to show: (1) his lawyer's performance fell below an objective standard of reasonable representation; and (2) prejudice arose from the lawyer's deficient performance. *State v. Bradley*, 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing *Strickland v. Washington*, 466 U.S. 668, 104, S.Ct. 2052, 80 L.Ed.2d 674 (1984). As both prongs must be established, if the performance was not deficient, then there is no need to review for prejudice.

**{¶95}** In evaluating the alleged deficient performance, our review is highly deferential to counsel's decision as there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Bradley*, 42 Ohio St.3d at 142-143, citing *Strickland*, 466 U.S. at 689. *See also State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995) (defendant must overcome the strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy). There exist "countless ways to provide effective assistance in any given case." *Bradley*, 42 Ohio St.3d at 142, citing *Strickland*, 466 U.S. at 689.

**{¶96}** To show prejudice, a defendant must prove his lawyer's errors were so serious that there is a reasonable probability the result of the proceedings would have been different. *Carter*, 72 Ohio St.3d at 558. Lesser tests of prejudice have been rejected: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Bradley*, 42 Ohio St.3d at fn. 1, quoting *Strickland*, 466 U.S. at 693. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding fundamentally unfair due to the performance of trial counsel. *Carter*, 72 Ohio St.3d at 558, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

**{¶97}** Two of Appellant's ineffective assistance of counsel allegations involve the issues presented in assignment of error number four. Appellant complains that, although counsel objected to the testimony regarding a tip, counsel did not ask for a mistrial after that evidence was presented. He also urges the failure to object and move for mistrial during closing arguments was ineffective assistance of counsel. As aforementioned, Appellant believes the state relied on contents of the tip in its closing. Appellant concludes there is no strategic reason for failing to move for a mistrial since counsel objected to the evidence.

**{¶98}** Counsel was not ineffective for refraining from seeking a mistrial as to the detective's testimony on the tip. Defense counsel timely objected to the testimony. However, the trial court overruled his objection and allowed the officer to

testify as to what he began investigating after the tip. We reviewed the trial court's decision in assignment of error number four. A mistrial request would merely be asking the trial court to change its mind on the prior ruling and find the proceeding must be terminated. *See, e.g., State v. Whitlow*, 7th Dist. No. 91 CA 10 (Mar. 31, 1994) ("counsel objected to the admission of the evidence and his objection was overruled by the trial judge. It would have been useless for him to pursue a motion for a mistrial."). There was neither deficient performance nor prejudice by the failure to seek a mistrial.

**{¶99}** As to the prosecutor's closing argument, in assignment of error number four, we found the statements contested on appeal could have been made by the state even in the absence of the testimony on the tip. Therefore, counsel's failure to object to the closing argument was not deficient performance; nor was there a reasonable probability the result would have been different had counsel objected.

**{¶100}** Appellant also sets forth an allegation of ineffective assistance of counsel relating to the third assignment of error. As aforementioned, counsel sought a mistrial on the grounds the detective testified about another investigation involving threats to the witness by an associate of the defendant. After the court denied the mistrial motion, defense counsel asked the detective about another name provided by the victim's girlfriend and then asked the purpose of the two photographic arrays. The detective answered that one was for the shooter and one was for the person who came to the house and threatened the witness. (Tr. 564).[2] Defense counsel had the detective clarify that no threats related to Appellant. (Tr. 565).

**{¶101}** Appellant states this questioning was deficient performance, noting counsel had previously made every effort to keep this testimony from the jury. Appellant believes the outcome of the trial would have been different but for defense counsel's further elicitations from the detective.

---

[2] Contrary to a suggestion in footnote 7 of Appellant's brief, the detective's testimony at suppression was not misleading. He stated that the second line-up had a dual purpose: he wanted to make sure an associate of Appellant was not the shooter, and he also wondered if that associate was the person who threatened the witness. (Supp.Hrg. Tr. at 29).

{¶102}    However, it can be considered a trial tactic to clarify the situation for the jury once the request for a mistrial was not granted.  Debatable trial strategy very rarely constitutes ineffective assistance of counsel.  *See State v. Thompson*, 33 Ohio St.3d 1, 10, 514 N.E.2d 407 (1987).  We are to refrain from second-guessing the strategic decisions of trial counsel.  *Carter*, 72 Ohio St.3d at 558.  Defense counsel's questioning did not fall below an objective standard of reasonable representation.  Moreover, due to the clarification that the threats did not relate to Appellant, any error was not so serious that the result of the trial was unreliable or the proceeding was fundamentally unfair.  *Carter*, 72 Ohio St.3d at 558, citing *Lockhart*, 506 U.S. at 369.  On these bases, this assignment of error is overruled.

{¶103}    For the foregoing reasons, the trial court's judgment is affirmed.


Waite, J., concurs.

DeGenaro, J., concurs.