[Cite as *State v. Rosas*, 2024-Ohio-2522.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

JUAN ROSAS,

    DEFENDANT-APPELLANT.

CASE NO. 3-23-42

O P I N I O N

---

**Appeal from Crawford County Common Pleas Court
Criminal Division
Trial Court No. 22 CR 0318**

**Judgment Affirmed**

**Date of Decision:  July 1, 2024**

---

**APPEARANCES:**

    *Christopher Bazeley* **for Appellant**

    *Daniel J. Stanley* **for Appellee**

**WALDICK, J.**

{¶1} Defendant-appellant, Juan Rosas ("Rosas"), brings this appeal from the October 17, 2023 judgment of the Crawford County Common Pleas Court sentencing him to an indefinite prison term of four to six years after Rosas was convicted by a jury of Burglary. On appeal, Rosas argues that he received ineffective assistance of trial counsel, that the trial court abused its discretion by denying his motion for a mistrial, and that his conviction for Burglary was not supported by legally sufficient evidence. For the reasons that follow, we affirm the judgment of the trial court.

*Background*

{¶2} On September 20, 2022, Rosas was indicted for Aggravated Burglary in violation of R.C. 2911.11(A)(1), a first degree felony. It was alleged that on September 8, 2022, Rosas and his girlfriend kicked in the door of an elderly woman's home with purpose to commit a theft offense. It was also alleged that Rosas, or his girlfriend, inflicted or threatened to inflict physical harm on the elderly woman's son when he entered the residence. Rosas pled not guilty to the charge.

{¶3} Rosas proceeded to a jury trial, which was held September 7-8, 2023. After the evidence was presented, the jury was instructed on the charge of Aggravated Burglary and three lesser-included offenses: Burglary as a second degree felony, Burglary as a third degree felony, and Trespass in a Habitation, a

fourth degree felony. Ultimately the jury was unable to reach an agreement as to the charge of Aggravated Burglary; however, the jury determined that Rosas was guilty of the lesser-included offense of Burglary as a second degree felony in violation of R.C. 2911.12(A)(1).

{¶4} On October 17, 2023, Rosas was sentenced to serve an indefinite prison term of four to six years. It is from this judgment that he appeals, asserting the following assignments of error for our review.

## First Assignment of Error

**Rosas' defense was prejudiced by his trial attorney's ineffective assistance of counsel.**

## Second Assignment of Error

**The trial court abused its discretion when it overruled Rosas' motion for a mistrial.**

## Third Assignment of Error

**Rosas' conviction is not supported by legally insufficient** [sic] **evidence.**

{¶5} For ease of discussion, we elect to address the assignments of error out of the order in which they were raised.

### *Third Assignment of Error*

{¶6} In his third assignment of error, Rosas argues that there was insufficient evidence presented to convict him.

#### Standard of Review

**{¶7}** "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Groce*, 163 Ohio St.3d 387, 2020-Ohio-6671, ¶ 6. Therefore, our review is de novo. *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, ¶ 3. In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus (superseded by constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 102, (1997), fn. 4) following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

Controlling Statute

**{¶8}** Rosas was convicted of Burglary in violation of R.C. 2911.12(A)(1), which reads as follows:

(A) No person, by force, stealth, or deception, shall do any of the following:

(1) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense[.]

-4-

Evidence Presented

{¶9} B.H. is an elderly German woman who lived by herself in Bucyrus. B.H. lived in a building that was subdivided into separate apartments. She occupied "Unit 1." Rosas and his girlfriend lived in "Unit 7" in the same building. B.H. was familiar with Rosas and his girlfriend but she did not know their names.

{¶10} B.H. did not have a vehicle and she did not drive. She was visited by one of her children, Robert, approximately three times per week. On September 8, 2022, Robert came to B.H.'s residence and picked her up to take her to the Marion Popcorn Festival. They traveled together to the festival, stayed for a short time, then left. Before returning home, Robert and B.H. stopped to eat at a pizza establishment and then went to get groceries.

{¶11} When B.H. and Robert returned to B.H.'s residence, Robert carried some groceries to the back door. B.H. had an exterior entrance to her apartment and a separate interior entrance that she never used. The interior entrance led to a common area accessible by all residents.

{¶12} Robert used the numerical code to unlock the rear exterior door; however, a separate lock had been engaged on the door that was not usually used by B.H. Neither Robert nor B.H. had a key to the separate lock, so Robert went around to the interior entrance. When he did, he saw that the front door had been "kicked open."

{¶13} Robert entered the apartment through the broken door and he saw Rosas laying on B.H.'s couch and a woman in B.H.'s kitchen. The woman was going through a drawer of medication. When the woman noticed Robert, she grabbed two knives from the butcher's block and pointed them at Robert.

{¶14} According to Robert, Rosas got up from the couch and fled past him through the busted interior door. The woman with the knives backed into the apartment and demanded to be let outside. As the woman retreated toward the back door, Robert called 911 and described the situation and both of the intruders. Eventually the woman dropped the knives and fled.

{¶15} Once the woman fled, Robert opened the back, exterior door to tell his mother it was safe to enter. When he did, he saw Rosas standing on the back porch with B.H. Rosas was asking B.H. why she was on "his" porch. B.H. was confused and indicated that she lived there. When police sirens could be heard, Rosas and the female intruder fled the area.

{¶16} Law enforcement officers responded to the scene and learned that Rosas and the woman left behind a pair of women's jeans, a hair tie, and a cell phone. The cell phone had a case on it that contained a debit card with Rosas's name.

{¶17} There was also a cigarette that had to be from the intruders because Robert and B.H. did not smoke. In addition, someone had apparently eaten a yogurt from the refrigerator as it was out on the table. Further, there was a handwritten note on a "To Do" pad that stated: "Whatever you like DADDY Im [sic] so happy I cant

[sic] even cry." (State's Ex. H-4). The note was not written by Robert or B.H. After checking through her things, B.H. realized that she was missing some hypodermic needles.

{¶18} B.H. told the officers that the people who were in her house lived in the building in Unit 7. Officers went to Unit 7 and knocked on the door but nobody answered.

{¶19} Later the same night, shortly after 9 p.m., law enforcement received a call from an individual wanting to report "fire hazards in the apartment." The caller was a female who advised that she lived in Unit 7 of the residence in question. Law enforcement officers went to the residence and spoke with the woman, Kelly Hardesty.

{¶20} Officers asked Kelly about the incident that had occurred earlier in the day and Kelly stated that she was taking a bath during the "robbery." When the officer asked how Kelly knew there was a "robbery," she stated she saw officers walking around the perimeter of the place. The officer noted that Kelly matched the description that had been given of the female who had burglarized B.H.'s home and that she lived in the unit that B.H. had specified. The officer indicated he wanted to speak with Kelly further.

{¶21} Rosas came outside while the officers were speaking with Kelly. He initially would not answer whether he knew Kelly; however, shortly thereafter he acknowledged that Kelly was his girlfriend.

{¶22} Rosas told the officers that he was in his residence earlier in the day when he heard screaming. He stated that he went down to see what was happening and that was when he saw B.H. on her back porch. Rosas told the officers that he saw Kelly inside the residence and he told her to get out of there.

{¶23} Rosas and Kelly were detained in the backseat of the same cruiser. While they were together in the back of the cruiser, Kelly indicated that they would stick to a story of when they got back from the store the door to B.H.'s apartment was open.

{¶24} B.H. was brought to the cruiser to see if the individuals matched the intruders to her apartment. B.H. affirmatively identified both Rosas and Kelly.

{¶25} Rosas was eventually interviewed by police at the station. He claimed that he was not present in B.H.'s residence, and that he was not home at the time of the Burglary.[1]

Analysis

{¶26} Burglary pursuant to R.C. 2911.12(A)(1) requires proof that another person was actually present in the occupied structure. Here, Rosas argues that, even when viewing the evidence in the light most favorable to the State, he did not remain on the premises once Robert entered; rather he immediately fled. Rosas argues that since there is no evidence that he remained in the apartment once Robert returned,

---

[1] We note that Rosas testified in his own defense, claiming that he was never in B.H.'s apartment that day. Given that Rosas is challenging the sufficiency of the evidence in the State's case, we need not evaluate the weight that should be given to Rosas's testimony.

there was no one "present" at the time of the offense as required by R.C. 2911.12(A)(1).

**{¶27}** Rosas's legal argument has been rejected by multiple Ohio Appellate Courts. The Fourth, Eighth, and Ninth Districts have all held that "a person need not be present in order to sustain [a conviction under] R.C. 2911.12(A)(1) [when a defendant enters the premises]. Instead, a burglary conviction may stand if, during any time that the defendant is trespassing, a person enters the premises." *State v. Fairrow,* 4th Dist. Nos. 02CA2668 & 02CA2680, 2004–Ohio–3145, at ¶ 28, citing *State v. Davis,* 8th Dist. No. 83033, 2004–Ohio–1908, at ¶ 16; *State v. Scurry*, 9th Dist. Summit No. 25116, 2011-Ohio-2243, ¶¶ 9-10. We agree with the reasoning of the other appellate courts.

**{¶28}** Here, the State presented evidence that Rosas and Kelly kicked in the door of B.H.'s residence, trespassed within, and committed a theft offense. Robert and B.H. returned to the residence while the incident was ongoing, rendering the offense a Burglary under R.C. 2911.12(A)(1) as explained in *Fairrow*. As the evidence presented, when looked at in a light most favorable to the State, supports a Burglary conviction under R.C. 2911.12(A)(1) beyond a reasonable doubt, Rosas's third assignment of error is overruled.

*First Assignment of Error*

**{¶29}** In his first assignment of error, Rosas argues that he received ineffective assistance of trial counsel.

Standard of Review

**{¶30}** A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). The failure to prove either prong is fatal. *State v. Madrigal,* 87 Ohio St.3d 378, 389, 2000–Ohio–448. In the event of deficient or unreasonable performance, prejudice results when " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989), quoting *Strickland* at 694; *see also*, *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309.

Analysis

**{¶31}** Rosas argues that his trial counsel was ineffective for failing to file a pre-trial suppression motion related to a photo lineup wherein Robert purportedly identified Rosas as the male individual he saw inside B.H.'s apartment. Rosas's argument fails because he is both unable to establish that his counsel was ineffective and because he is unable to establish any prejudice.

**{¶32}** Generally, failure to file a suppression motion does not constitute per se ineffective assistance of counsel. *State v. Madrigal*, 87 Ohio St.3d 378, 2000-Ohio-448. Moreover, for counsel to be ineffective for failing to file a suppression

motion, Rosas has to show that the motion would have been meritorious. Here, he is unable to do so.

{¶33} At trial, a photo array was first mentioned during the testimony of a Bucyrus police officer. The police officer testified that he eventually brought Robert to the police station to do a "photo lineup identification of the suspects." (Tr. at 158). When the "photo lineup" was mentioned, defense counsel immediately objected. The following discussion was then held outside the presence of the jury.

> [Defense Counsel]: At this point I would move for a mistrial. The state never provided me with anything other than his report discussing a lineup. They never provided the photo. They never provided any of that lineup. They didn't provide any of that lineup.
>
> [The court dismissed jury to talk about the issue at length.]
>
> * * *
>
> THE COURT: Let's go on record please. All right. Apparently there was a photo lineup in which the witness in this case may or may not have been but I'm guessing, probably picked out the defendant in this particular case. [Defense counsel] has not only objected, he's asked for a mistrial saying that he was not given a copy of the photo array or the pictures. I'll let the state respond first.
>
> [Prosecutor]: Thank you, Judge. [defense counsel] knows that the photo array occurred because Page 25 of 25 of the police report it begins, On this date, September 18th, Robert Riley came on the station to do a photo lineup of suspects. We never received, I don't know if it exists, the actual lineup itself. This is not the mechanism to dispute discovery. [Defense counsel] knew that occurred and clearly waited to request a mistrial. A mistrial is not the proper remedy. I'm only going through the process. Mr. Riley will testify about ID, and then if he's impeached about ID, I would go through the photo lineup as far as that he already picked out Mr. Rosas from the photo lineup.

> THE COURT: All right. [Defense counsel], there was no prior motion of suppression or anything like that that happened before, but I'll let you go ahead and make your argument.
>
> [Defense Counsel]: Your Honor, Rule 16 gives the state the responsibility and ensures all the discovery the defendant has. The fact that if there's a photo lineup, I don't have the photo array. I don't have anything. This could have been an issue of suppression they could have obtained on down the road or before today. I understand the state's theory that just because it's mentioned in the report, I didn't know anything about the photo array other than that it occurred and that this gentleman allegedly identified the defendant.

(Tr. at 158-161).

**{¶34}** Following some further discussion, the trial court indicated it was going to allow the officer to be questioned about the photo array outside the presence of the jury to learn how the photo array was done. The trial court indicated that once it heard the testimony, it would determine if the jury could hear the evidence related to the photo array. Essentially, the trial court was allowing a midtrial suppression hearing.

**{¶35}** The officer then testified outside the presence of the jury regarding the photo array, indicating how he thought it was done; however, he indicated he only watched the procedure through soundproof glass, he did not participate.

**{¶36}** After hearing the testimony, the trial court admonished the parties, indicating that the State should have provided the photo array and that defense

counsel should have challenged the matter earlier than during the trial.[2] Ultimately,

however, the trial court stated as follows:

> The defendant in this case is a Hispanic male. I have no idea what photographs were shown or whether they in any way, shape or form resemble the defendant in this particular case. And not knowing that information, I can't let the photo array information go forward right now.
>
> However, this is my second ruling: Because there's no unfair surprise in this, because the state—or the defense clearly knew, okay, if in rebuttal, because I firmly suspect the defense through the opening statement, as of right now my understanding of the defense is and from the opening statement is, the state is the defendant was in the apartment building or whatever you want to call it, the domicile, and was identified. I assume the defense is going to have to say that the witness, the eyewitness in this case was either mistaken or lying, whichever is the case. * * * If that's the situation, then the credibility has been attacked and I will allow rebuttal evidence in that case. And if the state wishes to bring in the person who actually did [the [photo array], all right, not the person who watched it, if the pictures are turned over to [defense counsel] tonight, all right, and if he wants to come in and do that, I'll listen again and then I'll, we'll do another examination outside the presence of the jury and I would consider letting it in. The reason I would do that is because there's no unfair surprise in this particular matter.

(Tr. at 174-175).

**{¶37}** The trial court then did not allow the State to present the results of the

photo array, and there is no indication in the record that Rosas was ever identified

in the photo array. The photo array was not further discussed in any more detail

during the trial.

---

[2] The trial court actually stated it was more frustrated with the State than defense counsel. (Tr. at 177).

{¶38} The record as a whole reflects that the trial court effectively "granted" defense counsel's midtrial suppression motion, preventing the State from presenting any evidence about the results of the photo array. Given that the results of the photo array *were never presented to the jury*, and *given that defense counsel was successful in keeping this evidence from being presented*, we find no ineffective assistance of counsel for failure to file a pretrial suppression motion.

{¶39} Moreover, even if there was somehow a deficiency with counsel's performance, B.H. and Robert both affirmatively identified Rosas at trial, thus there could be no prejudice. As Rosas does not demonstrate ineffective assistance of counsel or prejudice in this matter, his first assignment of error is overruled.

*Second Assignment of Error*

{¶40} In his second assignment of error, Rosas argues that the trial court erred by denying his motion for a mistrial.

Standard of Review

{¶41} We review the denial of a motion for a mistrial under an abuse of discretion standard. *State v. Shoaf*, 3d Dist. Hancock Nos. 5-21-21, 5-21-22, 2022-Ohio-3605, ¶ 46. Mistrials should only be granted in situations where a fair trial becomes impossible. *Id*.

Analysis

{¶42} Rosas argues that the trial court abused its discretion by denying the motion for a mistrial that he made regarding the photo array issues. However, as

*Shoaf*, *supra*, states, mistrials should only be granted when a fair trial becomes impossible. *Id.*

**{¶43}** Here, the results of the photo array were never presented to the jury. The trial court essentially held a midtrial suppression hearing and determined that the photo array would not be admissible unless certain contingencies were met and the State never sought to reintroduce any evidence regarding the photo array.

**{¶44}** On the record before us, Rosas does not demonstrate any error that would warrant a mistrial. Further, we note that to show an abuse of discretion in failing to grant a mistrial, Rosas must demonstrate material prejudice. *State v. Mitchell*, 7th Dist. Mahoning No. 14 MA 0119, 2016-Ohio-1439, ¶ 54. As we determined in the first assignment of error, there is no prejudice here even if there was an error, thus the trial court did not abuse its discretion by denying the motion for a mistrial. Accordingly, Rosas's second assignment of error is overruled.

*Conclusion*

**{¶45}** Having found no error prejudicial to Rosas in the particulars assigned and argued, his assignments of error are overruled and the judgment of the Crawford County Common Pleas Court is affirmed.

***Judgment Affirmed***

**WILLAMOWSKI, P.J. and MILLER, J., concur.**